1   JAMERSON C. ALLEN (State Bar No. 132866)
    CORTNEY MCDEVITT (State Bar No. 241879)
2   JACKSON LEWIS LLP
    199 Fremont Street, 10th Floor
3   San Francisco, CA 94105
    Telephone    415.394.9400
4   Facsimile:    415.394.9401

5   IRA P. ROTHKEN (State Bar No. 160029)
    ROTHKEN LAW FIRM LLP
6   3 Hamilton Landing, Suite 280
    Novato, CA 94949
7   Telephone:   415.924.4250

8   Attorneys for Defendants FRIENDFINDER
    NETWORKS INC. (also erroneously sued as
9   PENTHOUSE MEDIA GROUP, INC.), VARIOUS,
    INC., PAUL ASHER and CARMELA MONTI
10

11                  UNITED STATE DISTRICT COURT

12               NORTHERN DISTRICT OF CALIFORNIA

13

14   NATALIE CEDENO,                          U.S.D.C. Case No. _____

15              Plaintiff,                    **DEFENDANTS' NOTICE OF
                                              REMOVAL OF ACTION UNDER 28**
16   v.                                       **U.S.C. SECTION 1441(a) (FEDERAL
                                              QUESTION JURISDICTION)**
17   FRIENDFINDER NETWORKS, INC.,
     PENTHOUSE MEDIA GROUP, INC.,
18   VARIOUS, INC., PAUL ASHER, an Individual,
     CARMELA MONTI, an Individual, DOES 1-20
19   inclusive.

20              Defendants.

21

22          TO  THE  CLERK  OF  THE  UNITED  STATES  DISTRICT  COURT  FOR  THE

23   NORTHERN DISTRICT OF CALIFORNIA:

24          PLEASE TAKE NOTICE that Defendants FRIENDFINDER NETWORKS INC. (also

25   erroneously sued as "PENTHOUSE MEDIA GROUP, INC."), VARIOUS, INC., PAUL ASHER

26   and CARMELA MONTI, (collectively "Defendants") hereby remove to this Court the state court

27   action described below based upon this Court's federal question jurisdiction:

28          1.      On April 22, 2009, Plaintiff NATALIE CEDENO ("Plaintiff") filed a Summons

                                             1

DEFENDANTS' NOTICE OF REMOVAL OF ACTION UNDER
28 U.S.C. SECTION 1441(a) (FEDERAL QUESTION JURISDICTION)          U. S.D.C. Case No.

Dockets.Justia.com

1   and Complaint ("Complaint") in the Superior Court of the State of California in and for the

2   County of Santa Clara, entitled "NATALIE CEDENO v. FRIENDFINDER NETWORKS, INC.,

3   PENTHOUSE MEDIA GROUP, INC., VARIOUS, INC., PAUL ASHER, an Individual,

4   CARMELA MONTI, an Individual, DOES 1-20 inclusive" as case number 109CV140628,

5   attached hereto as Exhibit 1.

6       2.      Defendants FriendFinder Networks Inc and Various, Inc. were served with the

7   Summons and Complaint on or about April 23, 2009. Defendant Paul Asher was served with the

8   Summons and Complaint on or about April 24, 2009. Defendant Carmela Monti has not yet been

9   served with the Summons and Complaint (although Plaintiff purports such service was

10  accomplished on May 5, 2009) and joins in this Petition for Removal.

11      3.      Accordingly, the Notice of Removal is filed within the time provided for by 28

12  U.S.C § 1446(b) as Defendants are removing this action within 30 days of the Complaint first

13  being filed and served on a defendant.

14      4.      Plaintiff's Second Cause of Action in her Complaint alleges, among other matters,

15  that Defendants violated Plaintiff's rights under "Title VII of the Civil Rights Act of 1964", 42

16  U.S.C. §2000e.  Accordingly, this action is a civil action of which this Court has original

17  jurisdiction under 28 U.S.C. § 1331 and is one which may be removed to this Court by Defendant

18  pursuant to the provisions of 28 U.S.C § 1441(b). This Court has supplemental jurisdiction over

19  Plaintiff's state law claims pursuant to 28 U.S.C. §1441(c).

20      5.      Venue lies in the United States District Court for the Northern District of

21  California pursuant to 28 U.S.C. §§ 1441(a) and 1391(b) because the state court action was filed

22  in this District and because this is the judicial district in which the alleged unlawful actions took

23  place.

24      6.      Intradistrict Assignment – Pursuant to Northern District of California Civil Local

25  Rule 3-5 & 3-2, this matter is properly assigned to the San Jose Division because Plaintiff's

26  allegations are based on events that took place in Santa Clara County.

27      7.      All named Defendants join in this Notice of Removal.

28      8.      All papers and process which make up the State of California, County of Santa

2

DEFENDANTS' NOTICE OF REMOVAL OF ACTION UNDER
28 U.S.C. SECTION 1441(a) (FEDERAL QUESTION JURISDICTION)          U. S.D.C. Case No.

1   Clara, Superior Court's file are attached hereto as Exhibits 2 - 6.

2        9.      For all of the foregoing reasons, this Court has jurisdiction under 28 U.S.C.

3   §§ 1331 and 1441(a) and (b).

4        WHEREFORE, Defendants hereby remove the above captioned matter now pending in

5   the Superior Court of the State of California for Santa Clara County to this Court.

6

7   Dated: May 22, 2009                    JACKSON LEWIS LLP

8

9                                    By:

10                                       Jamerson C. Allen
                                         Cortney McDevitt
11                                       Attorneys for Defendants FRIENDFINDER
                                         NETWORKS INC. (also erroneously sued as
12                                       PENTHOUSE MEDIA GROUP, INC.), VARIOUS,
                                         INC., PAUL ASHER and CARMELA MONTI
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                         3

# EXHIBIT 1

# SUMMONS
## (CITACION JUDICIAL)



FILED SUM-100

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

APR 22 2009

David H. Yamasaki, Chief Exec Officer/Clerk
Superior Court Santa Clara, California

By: _____ Deputy Clerk

J. Gao-Nguyen

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
FriendFinder Networks, Inc., Penthouse Media Group, Inc., Various, Inc.,
Paul Asher, an individual, Carmela Monti, an individual, Does 1-20,
inclusive.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
Natalie Cedeno

---

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

---

The name and address of the court is:
*(El nombre y dirección de la corte es):*

Superior Court of the County of Santa Clara
191 First Street
San Jose, CA. 95113

CASE NUMBER:
*(Número del Caso):*  **109CV140628**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Amanda Metcalf, Law Offices of Amanda Metcalf, 29 Marin Bay Park Court, San Rafael, CA. 94901; Tel:
415-454-0945

DATE: APR 22 2009          DAVID H. YAMASAKI          Clerk, by          J. Gao-Nguyen          Deputy
*(Fecha)*                  Chief Executive Officer/Clerk          *(Secretario)*                    *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*

4. ☐ by personal delivery on *(date):*

[SEAL]

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465

American LegalNet, Inc. | www.USCourtForms.com

1  Amanda Metcalf (State Bar No. 57177)
   Law Offices of Amanda Metcalf
2  29 Marin Bay Park Court
   San Rafael, CA. 94901
3  Tel: (415) 454-0945
4  Fax: (415) 454-9895

5  Attorneys for Plaintiff Natalie Cedeno

FILED  Santa Clara Co
04/22/09  11:35am
David H. Yamasaki
Chief Executive Offic
By: Jcaonsuyen DTSCIV
R#20090004360?
$350.00
TL          $350.00
Case: 1-09-CV-140628
J. Cao-Nguyen

6

7          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8               **FOR THE COUNTY OF SANTA CLARA**

9                    **(Unlimited Jurisdiction)**

10

11  NATALIE CEDENO,                    )    CASE NO. **109CV140628**
                                       )
12                   Plaintiff,        )    **COMPLAINT FOR DAMAGES AND**
                                       )    **REQUEST FOR JURY TRIAL**
13  v.                                 )
                                       )
14  FRIENDFINDER NETWORKS, INC.,       )    1. Retaliation in violation of FEHA
    PENTHOUSE MEDIA GROUP, INC.,       )    2. Retaliation if violation of Title VII
15  VARIOUS, INC., PAUL ASHER, an      )    3. Retaliation in violation of Calif. Labor Code
    Individual, CARMELA MONTI, an      )    4. Wrongful Termination
16  Individual, DOES 1-20, inclusive.  )    5. Breach of Contract
                                       )    6. Breach of Covenant;Good Faith /Fair Dealing
17                                     )    7. Conspiracy to Defraud
                                       )    8. Intentional Infliction of Emotional Distress
18                   Defendants.       )    9. Negligent Infliction of Emotional Distress
                                       )    10. Unfair Competition
19                                     )
20

21                              **BY FAX**

22          COMES NOW Plaintiff Natalie Cedeno, by and through her attorneys, for her Complaint

23  in the above-captioned action and states to this Honorable Court as follows:

24                          **PRELIMINARY STATEMENT**

25          1.      Natalie Cedeno brings this action against FriendFinder Networks Incorporated,

26  Penthouse Media Group Incorporated, and Various Incorporated, (referred to collectively as

27  "FriendFinder" or "the company"); Paul Asher, an individual and Carmela Monti, an individual,

28

1  for retaliation against Plaintiff for complaining about and opposing defendant's discriminatory,

2  unfair and illegal employment policies and practices and ultimately for wrongfully discharging

3  Plaintiff on January 29, 2009 in violation of public policy and in breach of her three-year written

4  contract of employment. Defendants have acknowledged that Plaintiff's discharge (with

5  approximately 2 years remaining on her employment contract) was not for cause. Plaintiff

6  alleges the following causes of action:

7

8       I.    Retaliation in violation of the California Fair Employment and Housing

9             Act ("FEHA"), California Government Code Sec. 12940, et seq.;

10

11      II.   Retaliation in violation of Title VII of the Civil Rights Act of 1964, 42

12            USC Sec. 2000, et seq.(Title VII");

13      III.  Retaliation in violation of California Labor Code Sec. 1102.5(c)

14      IV.   Wrongful termination in violation of the public policy of the State of

15            California;

16      V.    Breach of Contract;

17      VI.   Breach of Covenant of Good Faith and Fair Dealing

18

19      VII.  Conspiracy to Defraud

20      VIII. Intentional Infliction of Emotional Distress

21      IX.   Negligent Infliction of Emotional Distress

22      X.    Violation of Unfair Competition Statute

23                              **PARTIES**

24      2.    Plaintiff, Natalie Cedeno, was employed by defendants from August, 2001 to

25  January 30, 2008 as Director of Human Resources of each of the above-named corporations.

26  Plaintiff is married, the mother of four young children, a veteran of the United States Army and a

27  resident of the State of California. When Plaintiff was summarily discharged without prior notice

28

2

COMPLAINT

1  or warning on January 29, 2009, she was pregnant. On the date of her discharge Defendants

2  stopped all salary payments owed under Plaintiff's employment contract and terminated her

3  medical benefits. Since her termination, Plaintiff, who has for several years been the sole

4  financial support of her family (her husband provides care for their young children) has not been

5  able to secure alternate employment and has not been able to provide financial support or

6  medical care for herself, her unborn child, or her four other school-age children.

7

8  3.      Plaintiff is informed and believes and thereon alleges that Defendant FriendFinder

9  Networks, Inc. is a corporation organized under the laws of the State of Nevada, currently doing

10  business in the City of Sunnyvale in Santa Clara County, California. Plaintiff is informed and

11  believes and thereon alleges that Defendant Penthouse Media Group, Inc. is or was a corporation

12  organized under the laws of the State of New York.  Plaintiff is informed and believes and

13  thereon alleges that Defendant Various, Inc. is a corporation organized under the laws of the

14  State of California, with its principal place of business in the County of Santa Clara.  Plaintiff

15  was hired in 2001 by FriendFinder, Inc., an online social networking website. Plaintiff is

16

17  informed and believes and thereon alleges that in 2005 FriendFinder, Inc. was acquired by or

18  became Various, Inc., a company that operated on-line pornographic websites.  Plaintiff is

19  informed and believes and thereon alleges that In 2007 Various, Inc. began doing business

20  Penthouse Media Group, (publisher of Penthouse Magazine and owner of other adult

21  entertainment and pornographic enterprises). Plaintiff is informed and believes and thereon

22  alleges that in late 2008, Various, Inc. and Penthouse Media Group, Inc. began operating as

23

24  FriendFinder Networks, Inc.

25  4.      Defendant Paul Asher was at all relevant times mentioned herein Vice-President

26  of Operations, and Secretary of the Board of Directors of Defendants Various Inc., and

27  FriendFinder Networks, Inc.

28

3

5.     Defendant Carmela Monti was at all relevant times mentioned herein Vice-President of Human Resources of defendants Penthouse Media Group, Inc., and FriendFinder Networks, Inc.

6.     In addition to the Defendants named above, Plaintiff sues fictitious Defendants DOES 1 through 20, inclusive pursuant to Code of Civil Procedure Sec. 474, because their names, capacities, status, or facts showing them to be liable are not known at present. Plaintiff will amend this complaint to show their true names and capacities, together with appropriate charging language, when such information has been ascertained.

7.     Plaintiff is informed and believes and thereon alleges that each of the Defendants was, at all relevant times alleged herein, the agent and representative of the other Defendants and was acting, either in whole or in part, within the course and scope of such relationship. Therefore, Defendants, and each of them, including all fictitious Defendants sued herein, are liable to Plaintiff for the acts of the other Defendants.

## JURISDICTION AND VENUE

8.     All events referred to in the allegations contained herein occurred within the boundaries of the County of Santa Clara, State of California. Both jurisdiction and venue, therefore, properly lie with this Court.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

9.     Plaintiff submitted formal complaints the California Department of Fair Employment and Housing ("DFEH") against FriendFinder, Paul Asher and Carmela Monti alleging violations including but not limited to retaliation and wrongful termination. The DFEH issued a Right to Sue Notice to Plaintiff on February 27, 2009. Plaintiff also filed a formal complaint for retaliation and wrongful termination against these defendants with the Equal

4

Employment Opportunity Commission ("EEOC") and received a Right to Sue Notice on April 10, 2009. The above charges were amended on April 20, 2009.

## FACTUAL ALLEGATIONS

10.     From August 15, 2001 to January 29, 2009 Natalie Cedeno was hired by FriendFinder, Inc. and began working as its Director of Human Resources. In September, 2001, Plaintiff, in her capacity as Director of HR, along with the President, CEO, and General Counsel, formed FriendFinder Incorporated's Executive Team. Plaintiff was charged with reorganizing the operations of the company and worked diligently to accomplish this task. During the first four years of her employment Plaintiff worked an average of 60 hours per week. In 2002 the President and CEO added a quarterly bonus plan to her base salary. FriendFinder relied upon Plaintiff to ensure the company's orderly operation. In May 2002, shortly before the birth of her and her husband's fourth child, the CEO stressed how much the company relied upon her and requested that Plaintiff take as little time off as possible following the birth of her baby.     Ms. Cedeno responded in a manner that was typical of her devotion and commitment to the company; sacrificing herself and her family, she delivered her fourth child on a Thursday and returned to work the following Monday.

11.     In 2003 all customer service in addition to human resource employees began reporting to Plaintiff. Starting in 2004 the company's General Counsel reported to her as well as the Editorial staff. In 2005 the managers of 36 new employees added to the company, were also added to the staff over which Plaintiff had responsibility.

12.     At the time of her hire in 2001 the company was the subject of pending labor board investigations and 2 EEOC complaints. As a result of the operational structure and oversight provided by Plaintiff, from the time of her hire to December, 2007 no new lawsuits or charges of labor code violations were brought against the company.

5

COMPLAINT

13.     On November 11, 2007 Plaintiff entered into a three-year written contract with Penthouse Media Group, Inc. to serve as Human Resources Director of Various, Inc., in Santa Clara County (Exhibit "A").  Pursuant to the contract Plaintiff was to be paid a base salary of $143,000 per year with bonuses to be paid pursuant to the Bonus Plan incorporated into the contract. In addition to her salary the contract provided for equity compensation and other benefits.

14.     Prior to executing the employment contract Plaintiff consulted the General Counsel of Penthouse/FriendFinder regarding the meaning, intent, interpretation and application of various provisions of the written employment contract that had been presented to her. Plaintiff received multiple drafts of the contract. The final version of the contract contains changes requested by Plaintiff regarding continuation of benefits and also includes changes Plaintiff and other members of the executive team discussed with the General Counsel of Various /FreindFinders, Dave Bloom, regarding the "release of claims" provision contained in Paragraph 7. The final provision of the contract presented to plaintiff includes the following language in paragraph 7:

> "Termination for other than cause or resignation by the employee for
>
> Good Reason will result in the Company continuing to pay the
>
> Employee his base salary from the date of termination to a date which
>
> Is three years from the date of the employees Start date; provided that,
>
> Except as prohibited by state of [sic] federal law, you execute and
>
> Return to the Company a valid and binding release of all claims, in a
>
> Form reasonably satisfactory to the Company, related to or arising out
>
> Of your employment before such pay continuation commences."

15.     Prior to executing the final version of her employment contract General Counsel

6

COMPLAINT

1  Dave Bloom, specifically advised Plaintiff that the provision in paragraph 7 of the contract that

2  discusses "release of claims" did not release the company from any claims related to

3  discrimination, sexual harassment, retaliation, age and other protected classes.

4
5      16.     In December, 2007 at or about the time of acquisition of FriendFinder Inc. and

6  Various, Inc., by Penthouse Media Group, Marc Bell, CEO of Penthouse and current CEO of

7  FriendFinder Networks, Inc. visited the company's office in Sunnyvale. During that visit Bell

8  stated to employees of the company, including Plaintiff and Internet Group President, Rob

9  Brackett that "the women in technology are too ugly." Bell went on to state that he had "always

10 hired good looking women so that the men would be happy" and that we [FriendFinder] should

11 do this as well. Bracket complained to Plaintiff about Bell's directive and Plaintiff complained to

12 the General Counsel, Dave Bloom and Human Resources Vice-President, Carmela Monti about

13 her concerns. Monti made it clear that she did not want to address Plaintiff's complaint and

14 directed Plaintiff to "Drop it!" Over Plaintiff's objections, a few weeks later President Rob

15 Brackett reiterated Bell's comments (regarding not hiring ugly women) to the employees who

16 attended an executive team dinner.

17
18     17.     Following the December 2007 acquisition by Penthouse Media Group, Inc.

19 executives of FriendFinder, including Plaintiff, were promised salary increases. In January

20 Plaintiff discussed with the other members of the executive team her concern that the promised

21 raises had not been paid. On or about January 16, 2008, Plaintiff received an email from CEO

22 Marc Bell threatening to fire anyone who asked for a raise. After sending the email, Bell spoke

23 with Plaintiff by telephone and told her directly that she would be fired if she brought up the

24 issue of the raises again. On or about January 18, 2008, Plaintiff received an email from Dan

25 Staton, President of the Board of Directors of Penthouse/FriendFinder, directing her to report

26 directly and only to Camela Monti, thus restricting Plaintiff's reporting/communication with

27
28
                                          7

1   other members of the executive team.

2       18.     Following the acquisition by Penthouse, Vice-President Carmela Monti decided

3   that she wanted the Sunnyvale office (which had 300 employees) to have the same payroll

4   schedule as the Penthouse office in New York (which had fewer than 100 employees). Plaintiff

5   explained that the majority of the Sunnyvale staff consisted of hourly employees and that the

6   office time-clock would not function for a semi-monthly payroll. Plaintiff warned that

7   conversion to the new system would result in employees paycheck inaccuracies.

8

9       19.     In early January Plaintiff followed up her concerns by sending emails to Monti

10  explaining California labor laws regarding payment of hourly employees and asking her to

11  reconsider the planned payroll changes.  In February, 2008 Plaintiff complained about payroll

12  inaccuracies and the fact that employees were not being paid their full earnings, in violation of

13  California law. In response to her complaints Plaintiff received an email from Paul Asher stating

14  that employees would be paid as he and Monti decided and that there would be no further

15  discussion about the issue. In addition, Asher threatened to fire Plaintiff for insubordination

16  because of her complaints about the company's payroll practice.

17

18      20.     Under the new payroll procedure insisted upon by Asher and Monti employees,

19  because the time-clock could not accurately calculate the hours worked for a given pay cycle,

20  employees were erroneously advanced payroll hours and the overages were later inappropriately

21  deducted from their paychecks without their knowledge or consent. As late as March, 2008

22  Plaintiff continued to document to her superiors that due to the faulty payroll system, employees

23  were not receiving the overtime pay they had earned.

24

25      21.     Because Plaintiff in her capacity of Human Resources Director and member of the

26  executive management team was aware of the ongoing Labor code violations, she approached

27  the General Counsel of the company and asked him to seek permission from his boss to have an

28

8

COMPLAINT

1  outside labor attorney look into the matter. Plaintiff specifically provided the name of an outside

2  labor law firm.

3      22.     At the request of the General Counsel an outside labor attorney was contacted and

4  wrote an opinion letter to Penthouse/FriendFinder's corporate legal department advising that the

5

6  procedures Plaintiff had complained of violated California law. That attorney advised that that

7  the payroll and employee payment procedures used by the company were unacceptable.

8      23.     In or about March, 2008, following receipt of the opinion from outside counsel,

9

10  Plaintiff was directed to make the required changes and notify staff that the company would

11  return to the regular payroll procedure. Plaintiff was informed that Asher and Monti were very

12  upset with her for taking the payroll issue outside the company's Human Resources Department.

13  Plaintiff was also informed that "her bosses wanted to fire her but they didn't have grounds."

14  During the same month, divisions of the company that previously reported to Plaintiff were

15  removed from her authority and control.

16

17      24.     In March 2008, following the company's return to the previous payroll procedures

18  Carmela Monti directed Plaintiff to send staff a memo Monti had drafted that falsely accused the

19  company's payroll vendor of responsibility for the previous payroll problems. Plaintiff advised

20  Monti that she could not send the memo because she didn't feel comfortable lying to staff and

21

22  falsely accusing the vendor. In response to Plaintiff's refusal to send the memo Monti accused

23  plaintiff of not being a "team player." In April, 2008 the company announced bonuses to be paid

24  to members of the executive team. Despite her hard work and long years of devoted service

25  Plaintiff (and the General Counsel) received the lowest bonuses. Plaintiff's bonus was even

26  lower than the bonus given an employee she had supervised.

27

28      25.     In or about April, 2008 plaintiff received complaints regarding racist comments

9

1    concerning employees and prospective employees being made by the company's Controller, Al

2    Mercado. Mercado made racially disparaging comments regarding Indians, Asians and people

3    whose spoke English as their second language, which he admitted to Plaintiff. Plaintiff met with

4    and counseled Mr. Mercado on three separate occasions, yet his discriminatory conduct

5    continued.  The complaints regarding Mr. Mercado's racially disparaging comments were

6    received from Accounting Supervisor, Brinda Calori who had asked to be given a new

7
8    assignment because she was distressed by Mercado's conduct.  Plaintiff went to Carmela Monti

9    and recommended that Mercado be discharged. Monti refused to terminate Mercado and instead

10   ordered that Ms. Calori be terminated. Plaintiff objected to Monti's decision to terminate Ms.

11   Calori and complained to the Vice-President of Finance who refused to become involved.

12
13   Plaintiff is informed and believes and thereon alleges that Ms. Calori has filed a complaint with

14   the EEOC for retaliatory discharge resulting from her complaints.

15          26.     On or about May 13, 2008 Carmela Monti directed that background and credit

16   checks be done on all prospective employees. While such checks were standard procedure, it was

17
18   customary to have in place some parameters for assessing the information obtained from such

19   reports. Plaintiff explained to Monti that there were no guidelines or metrics for determining

20   what should be done with the information received, and no designation of what was an

21   acceptable or unacceptable credit score.  When Monti responded that the company wanted to see

22   how the employees were handling their money, Plaintiff objected that that Monti's reason did not

23   constitute a legitimate purpose for performing the credit checks.  Monti specifically ordered

24   Plaintiff to order a credit check on an ex-employee who had been accused of diverting funds

25   from the company, so that she could investigate his finances. When Plaintiff declined because

26
27   the request appeared to be illegal, Monti ordered the credit check herself.

28   //

10

27.     In or about May 2008, the company directed Plaintiff to change the company's employment application to require information regarding whether the employee had ever been arrested. Plaintiff sent Monti and the COO a copy of California Labor Code Provision sec. Section 432.7(a) which prohibits an employer from asking an applicant for employment to disclose information concerning an arrest or detention that did not result in conviction. Monti told Plaintiff, "You will make this change if you want to continue to work at FriendFinder." Plaintiff objected to Monti's directive and explained that because the Labor Code forbade the practice; she would not make the make the change in the employment application form that Monti requested  Plaintiff is informed and believes and thereon alleges that following that conversation with Monti, lawyers told her that the question could not be asked, and that Monti was forced to change all applications (the question had appeared on all forms used by the New York and Los Angeles offices for several years) so this question was not asked in any office.

28.     In May 2008 FriendFinder brought two Penthouse Pets and a male model into the Sunnyvale office to serve ice cream to the employees. The Pets were dressed in revealing attire that caused a female supervisor to complain that their presence and the fact that they were "porn stars" made her so uncomfortable that she would stay in her office away from this activity. The Pets went up to the supervisor's office and one of them placed her breasts on the employees head while two other employees' took pictures. The supervisor came to Plaintiff's office in tears.  She was visibly shaken and upset and informed Plaintiff that she was afraid the photos would be put on the Internet.  Plaintiff had previously telephoned Carmela Monti, informed her that the Pets were pinching the nipples of the male employees, rubbing their bare chest and inappropriately touching staff, and asked that Monti allow her to have the Pets removed from the office. Monti had refused Plaintiff's request and after the incident involving the supervisor Plaintiff called Monti again, asking that the Pets be removed because their behavior violated the company's

11

COMPLAINT

1  sexual harassment policy. Monti again refused Plaintiff's request that she be authorized to direct

2  the Pets to leave the office. COO Tony Previte appeared supported Monti's decision, stating that

3  the employee who complained was a "trouble maker."

4

5      29.    Roslyn Blackwell is employed by FriendFinder as a Technical Recruiter.

6  Blackwell has worked for the company since 2000. Blackwell, who is an African-American

7  female, is one of the top, if not "the top" performing Technical Recruiter employed by

8  FriendFinder. Blackwell worked under Plaintiff's supervision for several years. During the

9  period 2006 to the time Plaintiff was discharged in January, 2009, Blackwell was consistently the

10 company's top performer, bringing in 75% of all new hires.

11

12     30.    Shortly before the Penthouse acquisition in December 2007, Plaintiff raised

13 Blackwell's pay to approximately $80,000 per year because she was clearly underpaid. In or

14 about February 2008 the company hired J.B Smith as a Technical Recruiter. Smith, a white male

15 began at a starting salary of $110,000/year. In or about October 2008, the company hired Keith

16 Harris, a white male, as a Technical Recruiter at a starting salary of approximately $120,000 per

17 year. Neither Smith nor Harris performed at Blackwell's level. Neither produced 75% of the

18

19 company's hires or any number approximating that figure.

20     31.    Beginning in January, 2008 Plaintiff tried to persuade FriendFinder to increase

21 Blackwell's salary to an amount commensurate with her performance. Plaintiff appealed to

22 Carmela Monti to raise Blackwell's pay but her request was refused. Each time Plaintiff

23 proposed that the company increase Blackwell's pay to that commensurate with what the

24 company was paying white male recruiters with the same job description, her request was

25 refused. Because Blackwell was paid $25K to $35K less than the two men who had her same

26 job description but were performing at a lower level, Plaintiff continued to request that

27

28

12

1    Blackwell's pay be brought into line, and Monti continued to refuse. In November 2008 the

2    company promised Plaintiff that Blackwell would get a raise in March 2009. Plaintiff is

3    informed and believes and thereon alleges that as of time of filing this complaint, Ms. Blackwell

4    still has not received any pay increase.

5

6         32.     In May, 2008 Paul Asher assigned Plaintiff responsibility for the mass move of

7    300 FriendFinder employees from Palo Alto to Sunnyvale California for the purpose of

8    commencing 24 hour/day, 7 days/week operations of the company at that site. Asher gave

9    Plaintiff only 8 weeks to accomplish this task. Before the end of June 2008 Plaintiff had

10    accomplished the move smoothly and on time. Upon completion of the project Paul Asher

11    complimented the company's IT Director "for all his hard work" but said nothing to Plaintiff,

12    Asher assigned Plaintiff the additional task of getting a café in the building up and running. A

13    target date for opening the Café was set for the first business day of September, and by that date

14    Plaintiff had the café open for business. Asher's only remaining comment to Plaintiff regarding

15    the move of 300 employees for which she was responsible, was a directive to Plaintiff to find

16    out the IT Director's favorite restaurant and buy him a "a gift card for doing a great job."

17    Plaintiff was informed and believes and thereon alleges that Asher assigned these short-time

18

19    projects to Plaintiff with the belief that Plaintiff would not be able to accomplish the tasks and

20    that her failure would constitute the grounds for termination he and Monti were looking for.

21

22         33.     In or about July 2008 a company employee located in Las Vegas was suspected of

23    having embezzled funds from the company. After terminating the employee and filing a police

24    report, Carla Monti asked Plaintiff to run a credit report on the former employee. Plaintiff

25    objected on the ground that she had no lawful authority or grounds to request a credit report on a

26    person who was no longer associated with the company and who had not authorized the check.

27    Plaintiff sent Monti an email referring to the regulation that requires an authorizing signature

28

13

1  from a prospective employee. Plaintiff also reminded Monti that the company's contract with

2  the contractor that performed background checks required that the reports be ordered only for

3  legitimate employment purposes. Monti repeated her directive that Plaintiff obtain the report and

4  stated that she wanted it done "ASAP." When Plaintiff refused, Monti told Plaintiff that her

5  refusal was grounds for termination since she was "disobeying an order from her boss."

6

7       34.     In July 2008 the company's accounting department was experiencing difficulties

8  converting to a new accounting system. CEO Marc Bell arrived at the office in Sunnyvale and

9  after surveying the situation threatened to fire the Controller, Van Pieroni, and the Vice-

10 President of Finance. When Bell entered Plaintiff's office ranting and raving about the

11 accounting debacle Plaintiff asked him not to fire anyone and said she would get involved and

12 project manage to meet the deadline set for the end of July, which was three and a half weeks

13 away.

14

15      35.     Plaintiff investigated, set deadlines, and got staff trained. In the process Plaintiff

16 discovered information that raised issues regarding the competency of the contractors who had

17 been hired by COO Paul Asher. Based on that information the Controller lodged complaints

18 with the State of Florida regarding a contractor who misrepresented his status as a Certified

19 Public Accountant and asked that the contractor be fired. Asher refused to fire the contractor and

20 after the Controller made more complaints about the contractors hired by Paul Asher, the

21 Controller was fired. Plaintiff is informed and believes and thereon alleges that he Controller is

22 currently pursing claims against FriendFinder and Paul Asher for wrongful termination based on

23 retaliation.

24

25      36.     In or about July, 2008 stock option letters were distributed to employees of the

26 company. The Plaintiff and General Counsel, Dave Bloom (who were the executive team

27 members with the greatest seniority) received the lowest stock option benefits awarded to

28

14

COMPLAINT

members of the executive team. The executive team had been promised that their stock option benefits would be greater than those paid to any other category of employees. The stock benefits were to become operative when the company went public. Plaintiff was in fact the most senior executive staff member, yet the option benefits offered to her were lower that those offered to staff who were not even members of the executive team. Plaintiff asked Monti and Asher to explain why this had occurred but she never received a response from either of them.

37.     Plaintiff (and General Counsel Dave Bloom who had supported her on the payroll issue) received options for only 50,000 shares of stock. All other executive team members received options for 100,000 shares or more. The Las Vegas CTO, (JR) who had been disciplined multiple times and who was not a member of the executive team received an option for 75,000 shares. An employee who the Accounting Department claimed was guilty of making improper expenditures (he had charged the company $8,000 for an evening of dinner and lap dances) received an option for 100,000 shares. An employee Plaintiff managed for more than 4 years (Director of Customer Service) received an option for 100,000 shares and a member of the general staff (a programmer) received an option for 75,000 shares.

38,     On December 23, 2008 FriendFinder filed an S1 Statement with the Securities and Exchange Commission in preparation for its move to take the company public. The stock option benefits awarded by the company were to become effective once the company's IPO was approved. With the imminent approval of the IPO (and the failure of Asher and Monti's efforts to build a case for Plaintiff's dismissal for cause) the company decided to proceed to discharge Plaintiff at the end of January, 2009 to keep her from becoming eligible to exercise her stock option.

39.     In or about August or September, 2008, the Chief Technology Officer (CTO) of the Las Vegas office, Jason Rasberry, made inappropriate sexual comments concerning a female

15

1   employee (TE). The CTO said to 5-6 male coworkers in the presence of TE (the group was

2   standing together on a smoke break) "I've had seen TE naked and her breasts are too small." The

3   CTO admitted having made the comment. The CTO had a history of previous misconduct in the

4   workplace for which he had received disciplinary action. Prior to this incident the CTO had

5   asked a male applicant who was interviewing for a position in the company's Technology

6
    Department to "chose any item and he would have one of the girls on cams.com insert it into her
7
8   vagina." The applicant reported the incident to Human Resources and stated that he had decided

9   against pursuing employment with the company. In addition to having received prior

10  disciplinary action this CTO had been counseled on numerous times for inappropriate behavior

11  as well as gambling on the premises with staff he managed.

12

13      40.     As the Human Resources Director in charge of the Las Vegas facility, Plaintiff

14  investigated the charge and prepared a report regarding the incident in which she recommended

15  that the CTO be suspended for the September 2008 incident because he had received prior

16  disciplinary action for similar misconduct. Carmela Monti refused to approve Plaintiff's
17
    recommendation for disciplinary action, even though the company's General Counsel and the
18
19  President of the Las Vegas entity agreed with and supported Plaintiff's recommendation for

20  disciplinary action. When Plaintiff tried to support her recommendation for suspension based on

21  the CTO's prior misconduct, Monti again rejected her recommendation directed that Plaintiff not

22  have any further input or involvement with matters concerning the CTO.

23

24      41.     In September 2008 FriendFinder set up a new email system. Plaintiff was

25  informed by the Director of IT, Jeff Dougherty, that he was specifically directed by Paul Asher

26  that Plaintiff should not be included on the company wide list of executives who received emails

27  regarding management issues. As a result Plaintiff had to rely on other executives in the

28

16

COMPLAINT

1  company to forward emails to her in order to keep abreast of important information being

2  discussed among members of the executive team.

3    42.    Plaintiff is informed and believes and thereon alleges that after repeated

4  unsuccessful efforts by Paul Asher and Carmela Monti to manufacture grounds for firing

5  Plaintiff, in September 2008 Asher and Monti agreed upon a plan that was designed and intended

6  to coerce plaintiff's resignation.

7

8    43.    Asher and Monti agreed to create the position of West Coast Regional Director of

9  Human Resources and to fill the position with a person who would be placed in the Sunnyvale

10  office where Plaintiff worked, and would be retained only until such time as Plaintiff became

11  sufficiently frustrated and humiliated by her defacto demotion, that she resigned her

12  employment. Asher and Monti hired Sundari Dadant for this position Dadant was paid

13  substantially less than Plaintiff despite her position as Plaintiff's new overseer.

14

15    44.    Dadant was told during her job interview that there were serious problems with

16  Plaintiff, that Plaintiff was "on her way out" and would likely "quit as soon as Dadant was

17  hired." Dadant has informed Plaintiff that after she was hired she sat all day in her office with no

18  work to do and that she felt she was "duped." Dadant has also admitted to Plaintiff that she was

19  hired to coerce Plaintiff to quit her employment.

20

21    45.    During the period of Dadant's employment with the company Plaintiff was

22  frequently asked by Carmela Monti, how she and Dadant were getting along. As it happened

23  Plaintiff and Dadant got along very well, a fact which Plaintiff reported to Monti whenever she

24  was asked.

25    46.    In October 2008 Carmela Monti sent a public relations email to Plaintiff with

26  directions that she distribute the email to the entire staff. The email contained pictures of naked

27  women. Plaintiff requested that Monti allow the email to be modified to include links to the

28

17

COMPLAINT

1   pictures for those employees who chose to view them, because she did not feel it was appropriate

2   to direct unsolicited emails containing pornographic pictures to company employees. Monti

3   reminded Plaintiff where she worked and directed her to send the unmodified email. Plaintiff

4   declined to send the email and requested that instead Monti send it herself. Though she had

5   directed Plaintiff to send it, Monti would not send the email herself.

6

7       47.    By the end of 2008 it was apparent that Plaintiff was not taken in by Monti's and

8   Asher's scheme to deprive her of her employment. Plaintiff still did all the work she had always

9   done and she was not bothered by the fact that Dadant had been hired to force her resignation.

10   After Monti fired Plaintiff on January 29, 2009 (without Dadant's knowledge) Dadant (who was

11   on vacation at the time) was fired upon her return to the office on February, 2009.

12

13       48.    In January 2009, Carmela Monti directed the Benefit Manager, Holly Anderson,

14   to forge the signature of a former employee, Sondra Moore, who had filed an EEOC complaint

15   against the company alleging ADA violations, and who the company had failed to provide

16   COBRA benefits. At or about that time three separate complaints had been lodged against the

17   company for failing or refusing to comply with regulations regarding the provision of COBRA

18   benefits in a timely manner. The document Monti wanted Ms. Anderson to forge stated "by

19   signing your name you agree to mediation for legal purposes" and apart from having constituted

20   the fraudulent act of forgery, would have deprived Ms. Moore of specific legal rights. Plaintiff

21   was Ms. Anderson's supervisor. Plaintiff supported Ms. Anderson's decision and also refused to

22   forge the document. Monti was livid and expressed her anger with Plaintiff in an angry and

23   accusatory manner. Following Plaintiff's termination, the company failed to provide Plaintiff

24   timely and accurate information regarding her COBRA benefits. The company failed to notify

25   Plaintiff, as required by the Labor Code, of the substantial premium reduction she is entitled to

26   receive. As of the date of filing this Complaint the company still has not complied with the

27

28

18

COMPLAINT

1  Labor Code provision in question and still has not afforded Plaintiff the premium reduction she

2  is entitled to receive.

3     49.    Later in January 2009, Carmela Monti requested a conference call between her,

4  the new Regional HR Director, Dadant, Paul Asher and me. In the course of the call Monti and

5  Asher stated that they had been reading Dadant's emails and hers, and were going to "write them

6  up," for discussing the company's lack of strong top level management. The "write-up" Plaintiff

7  received charged numerous infractions but no specific information or examples of any of the

8  infractions charged. Plaintiff had not previously had any disciplinary action taken against her

9  during the entire period of her employment with the company. Monti refused to cite any

10 examples of the conclusory charges contained in the form presented to her and for that reason

11 plaintiff declined to sign the form.

12
13    50.    On January 27, 2009, two days prior to Plaintiff's termination, Plaintiff was

14 seated in front of her computer at the company office in Sunnyvale along with the Jason Webb,

15 the company's Desk Top Support Administrator, when they observed messages on Plaintiff's

16
17 monitor indicating that email had just been sent from her work computer to her home email

18 account. Both Plaintiff and the DTS Administrator were perplexed because neither of them had

19 sent any emails from Plaintiff's company email account. Plaintiff, like other employees in the

20 company, had on previous occasions forwarded emails to her home computer for the purpose of

21
22 completing work at home and for the purpose of preserving information. Plaintiff did not,

23 however, send the emails confirmed as "sent" while she and the DTS Administrator were seated

24 at her computer.

25    51.    The DTS Administrator stated that he had no idea why or how this was happening

26 and that he would investigate the matter. Later that day Plaintiff sent an email to IT Director, Jeff

27
28 Dougherty and to Carmela Monti advising them that there was a problem with her computer and

1    that someone was sending unauthorized emails from her computer. On January 28, 2009 while

2    sitting next the Director of IT at an executive team meeting, Plaintiff asked if he had received her

3    email regarding the problems of someone sending emails from her computer. Dougherty

4    acknowledged that he had received Plaintiff's email and stated only that he "had not had a

5    chance to look into it."

6

7         52.    On January 29, 2009 Carmela Monti came to Plaintiff's office and handed her the

8    Severance Agreement (a copy of which is attached hereto as Exhibit B). Monti never told

9    Plaintiff that her employment was terminated. She only asked Plaintiff to "help keep the staff

10   calm and asked if Plaintiff would be willing to tell the staff that she was leaving to be a stay at

11   home mom." When plaintiff was fired, the Benefit Manager resigned and walked out with her.

12

13        53.    After Plaintiff was terminated the company charged her with having illegally

14   taken "company property" (emails) by directing emails from her company account to her private

15   email account. On March 2, 2009, FriendFinder filed a Strategic Lawsuit Against Public

16   Participation (SLAPP suit) against Plaintiff in this court claiming that Plaintiff had violated

17   employment agreements with the company by forwarding emails received at work to her private

18   email account. The complaint filed by FriendFinder requests that the court issue a temporary

19   restraining order and preliminary and permanent injunction against Plaintiff, and further order

20   Plaintiff to "turn over to the company "all Plaintiffs' property including records, materials,

21   documents, data including copies of same related to Plaintiff's employees in her possession, and

22   prohibiting her from disclosing or otherwise using said information in any way."

23

24        54.    The clear purpose of the complaint filed by FriendFinder against Plaintiff is to

25   intimidate Plaintiff and to deprive Plaintiff of evidence of the wrongdoing perpetrated against her

26   by the company and its upper management employees. Plaintiff has agreed to preserve and has in

27   fact preserved all emails regarding her employment with the company that were in her

28

20

1  possession at the time she learned of the filing of Defendant's lawsuit against her. She has also

2  provided copies of those documents to a government agency for the purpose of preserving and

3  safeguarding said evidence.

4
### FIRST CAUSE OF ACTION
5  **Retaliation in violation of California Government Code Section 12940, et seq.**
   **(By Plaintiff against the FriendFinder Defendants, Carmela Monti and Paul Asher)**
6

7       55.    Plaintiff hereby incorporates by reference all other paragraphs of this Complaint,

8  as though here fully set forth.

9       56.    Plaintiff engaged in protected activity by opposing what she reasonably and in

10 good faith believed to be discriminatory treatment of women, ethnic minorities and members of

11 other protected classes that violated Government Code section 12940, et seq.

12      57.    Following these complaints, Defendants and each of them, subjected Plaintiff to

13 retaliation. The retaliatory acts included, but were not limited to, concocting a plan or plans to

14 deprive plaintiff of her employment and the benefits of her employment, designing and

15
16 perpetrating a fraudulent conspiracy to deprive plaintiff of her employment and the salary and

17 benefits of said employment, re-assigning plaintiff to an inferior workspace, failing and refusing

18 to pay raises plaintiff had earned and which were promised to plaintiff, excluding plaintiff from

19 company functions, subjecting Plaintiff to different expectations and greater scrutiny than her co-

20 workers, threatening to terminate plaintiff, terminating Plaintiff's employment, refusal to pay

21
22 salary and benefits owed pursuant to plaintiff's written employment contract, and the filing of a

23 Strategic Lawsuit Against Public Participation (SLAPP suit) in an attempt to frighten and

24 intimidate Plaintiff into abandoning her protests against the company's unlawful activities, from

25 preserving evidence of the company's wrongdoing and from supporting other claimants whose

26 rights have been violated by Defendants.

27

28

LAW OFFICES OF
AMANDA METCALF
SAN RAFAEL, CALIFORNIA

COMPLAINT

58. Plaintiff's complaints about discriminatory treatment of women, ethnic minorities and members of other protected classes was a motivating factor in Defendants FriendFinder's, Monti's and Asher's decisions to take adverse action against her.

59. Defendants' retaliatory conduct caused Plaintiff to suffer harm, including emotional distress and economic loss. Because a large portion of Plaintiff's economic damages may be easily ascertained, Plaintiff is entitled to prejudgment interest pursuant to Civil Code Section 3287.

60. Defendants' retaliatory conduct was a substantial factor in causing Plaintiff harm. The conduct of Defendants and each of them, constituted malice, oppression, fraud and/or despicable conduct warranting the imposition of punitive damages.

## SECOND CAUSE OF ACTION
### Retaliation in violation of Title VII of the Civil Rights Act of 1964, (Title VII")
### (By Plaintiff against the FriendFinder Defendants, Carmela Monti and Paul Asher)

61. Plaintiff hereby incorporates by reference all other paragraphs of this Complaint, as though here fully set forth.

62. Plaintiff complained to her supervisors Defendants Monti and Asher and other agents and/or employees of FriendFinder about what she reasonably believed to be discriminatory treatment of women, ethnic minorities and members of other protected classes as set forth herein.

63. Following these complaints, the FriendFinder Defendants, Monti and Asher subjected Plaintiff to retaliation. The retaliatory acts included, but were not limited to, concocting a plan or plans to deprive plaintiff of her employment and the benefits of her employment, designing and perpetrating a fraudulent conspiracy to deprive plaintiff of her employment and the salary and benefits of said employment, re-assigning plaintiff to an inferior workspace, failing and refusing to pay raises plaintiff had earned and which were promised to plaintiff, excluding plaintiff from company functions, subjecting Plaintiff to different

22

COMPLAINT

1    expectations and greater scrutiny than her co-workers, threatening to terminate plaintiff,

2    terminating Plaintiff's employment, refusal to pay salary and benefits owed pursuant to

3    plaintiff's written employment contract, and the filing of a Strategic Lawsuit Against Public

4    Participation (SLAPP suit) in an attempt to frighten and intimidate Plaintiff into abandoning her

5    protests against the company's unlawful activities, from preserving evidence of the company's

6    wrongdoing and from supporting other claimants whose rights have been violated by

7    Defendants.

8

9        64.    Plaintiff's complaints about discriminatory treatment of women, ethnic minorities

10   and members of other protected classes was a motivating factor in Defendants FriendFinder's,

11   Monti's and Asher's decisions to take adverse action against her.

12       65.    Defendants' retaliatory conduct caused Plaintiff to suffer harm, including

13   emotional distress and economic loss.

14

15       66.    Defendants' retaliatory conduct was a substantial factor in causing Plaintiff harm.

16   The conduct of Defendants and each of them, constituted malice, oppression, fraud and/or

17   despicable conduct warranting the imposition of punitive damages.

18                             **THIRD CAUSE OF ACTION**
                  **Retaliation in violation of Labor Code Section 1102.5(c)**
19   **(By Plaintiff against the FriendFinder Defendants, Carmela Monti and Paul Asher)**

20       67.    Plaintiff hereby incorporates by reference all other paragraphs of this Complaint,

21   as though here fully set forth.

22

23       68.    Plaintiff complained to Defendants Friend Finder, Monti and Asher and other

24   agents and/or employees of FriendFinder about what she reasonably believed to be violations of

25   state and federal laws, including, but not limited to, Labor and other Code provisions regarding

26   payment of wages, inquiries to applicants regarding arrests, background and credit checks, and

27   illegal discriminatory treatment of women, ethnic minorities and members of other protected

28

                                          23

LAW OFFICES OF
AMANDA METCALF
SAN RAFAEL, CALIFORNIA                                    COMPLAINT

1    classes as set forth herein, and refused to support, condone or participate in said illegal activity.

2        69.    Following these complaints, the FriendFinder Defendants, Monti and Asher

3    subjected Plaintiff to retaliation. The retaliatory acts included, but were not limited to,

4    concocting a plan or plans to deprive plaintiff of her employment and the benefits of her

5    employment, designing and perpetrating a fraudulent conspiracy to deprive plaintiff of her

6    employment and the salary and benefits of said employment, re-assigning plaintiff to an inferior

7    workspace, failing and refusing to pay raises plaintiff had earned and which were promised to

8    plaintiff, excluding plaintiff from company functions, subjecting Plaintiff to different

9    expectations and greater scrutiny than her co-workers, threatening to terminate plaintiff,

10   terminating Plaintiff's employment, refusal to pay salary and benefits owed pursuant to

11   Plaintiff's written employment contract, and the filing of a  Strategic Lawsuit Against Public

12   Participation (SLAPP suit) in an attempt to frighten and intimidate Plaintiff into abandoning her

13   protests against the company's unlawful activities, from preserving evidence of the company's

14

15   wrongdoing and from supporting other claimants whose rights have been violated by

16   Defendants.

17

18       70.    Plaintiff's complaints about Defendants' violations of law and discriminatory

19   treatment of women, ethnic minorities and members of other protected classes was a motivating

20   factor in Defendants FriendFinders', Monti's and Asher's decisions to take adverse action

21   against her.

22

23       71.    Defendants' retaliatory conduct caused Plaintiff to suffer harm, including

24   emotional distress and economic loss.

25       72.    Defendants' retaliatory conduct was a substantial factor in causing Plaintiff harm.

26   The conduct of Defendants and each of them, constituted malice, oppression, fraud and/or

27   despicable conduct warranting the imposition of punitive damages.

28

                                           24

Law Offices of
AMANDA METCALF
San Rafale, California

                                                                    COMPLAINT

**FOURTH CAUSE OF ACTION**
**Wrongful Termination In Violation of Public Policy**
**(By Plaintiff against the FriendFinder Defendants)**

73. Plaintiff hereby incorporates by reference all other paragraphs of this Complaint, as though here fully set forth.

74. Plaintiff was employed by Defendants Various, Inc., Penthouse Media Group, Inc., and FriendFinder Networks, Inc.

75. Plaintiff was terminated from her employment with Defendants.

76. Plaintiff's complaints regarding, and good faith, reasonable, opposition and refusal to participate in what she perceived to be violations of state and federal laws, including, but not limited to Labor laws and other Code provisions regarding payment of wages, inquiries to applicants regarding arrests, background and credit checks, and illegal discriminatory treatment of women, ethnic minorities and members of other protected classes as set forth herein, were the motivating reasons for Plaintiff's termination from her employment.

77. Defendants' unlawful termination of Plaintiff's employment caused Plaintiff harm, including emotional distress and economic loss. The conduct of Defendants and each of them, constituted malice, oppression, fraud and/or despicable conduct warranting the imposition of punitive damages.

**FIFTH CAUSE OF ACTION**
**Breach of Contract**
**(By Plaintiff against the FriendFinder Defendants)**

78. Plaintiff hereby incorporates by reference all other paragraphs of this Complaint, as though here fully set forth.

79. Plaintiff's written contract of employment (Exhibit A) specified the period of time that she would continue to be employed by Defendants. The contract provided that in the event plaintiff was discharged from her employment "not for cause" prior to the expiration of the

25

COMPLAINT

1   contract period, Plaintiff would continue to receive her salary and benefits for the duration of the

2   contract term, on the condition she provided defendants a document releasing all claims against

3   the company.

4

5       80.     On or about January 29, 2009, FriendFinder terminated Cedeno's employment.

6       81.     On or about March 2, 2009, FriendFinders' attorney, Jonathan Siegel,

7   acknowledged that the termination of Plaintiff's employment was "not for cause."

8       82.     Pursuant to the Plaintiff's employment contract FriendFinder promised to pay

9
    Cedeno's salary in the amount and in the time and manner specified in the contract for a period
10
11  of three years from the "start date" of her employment under the agreement. The contract

12  provides, in relevant part, that:

13      "Termination for other than cause or resignation for Good Reason will result in the
        company continuing to pay the employee his base salary from the date of termination to
14      the date which is three years from the date of the employees Start date; provided that,
        except as provided by state of [sic] federal law, you execute and return to the Company a
15      valid and binding release of all other claims, in a form reasonably satisfactory to the
16      Company, related to or arising out of your employment before such pay continuation
        commences. .." (Contract: Ex. "A," Para. 7)
17
        Between October 25, 2007 and October 31, 2007 and prior to executing the
18
19  Contract, Plaintiff conferred with FriendFinder General Counsel Dave Bloom regarding the

20  Contract, its meaning, interpretation and effect. Regarding the above-cited provision contained in

21  paragraph 7 of the Contract, Mr. Bloom told Cedeno that the provision did not release the

22  company from any claims related to discrimination, sexual harassment, retaliation, age and other

23  protected classes.

24
        83.     Based on the explanation and advice provided by Bloom Plaintiff prepared a
25
26  Release of Claims in which she released and discharged FriendFinder Network, Inc, its affiliates,

27  predecessors and successors from all claims that arose during the period of her employment

28  which claims were or are not concerning, related to or not arising from or associated with

                                            26

COMPLAINT

1  discrimination, sexual harassment, retaliation, age and other protected classes, claims or

2  claimants. By providing the Release to the FriendFinder Defendants Plaintiff performed all

3  things required to be done by her pursuant to her contract of employment and was and is entitled

4  to be paid the balance of the salary and benefits specified in her employment contract.

5

6       84.    Plaintiff has performed all obligations required of her to be performed under her

7  contract of employment. Defendants have breached Plaintiff's employment contract by failing

8  and refusing to pay to Plaintiff the balance of the salary and benefits owed under the contract.

9       85.    As a result of the breach and/or breaches of Plaintiff's employment contract by

10  the FriendFinder Defendants, and each of them, Plaintiff has suffered damages in an amount to

11  be proved at trial.

12
13                 **SIXTH CAUSE OF ACTION**
        **Breach of Covenant of Good Faith and Fair Dealing**
14          **(By Plaintiff against the FriendFinder Defendants)**

15       86.    Plaintiff hereby incorporates by reference all other paragraphs of this Complaint,

16  as though here fully set forth.

17
18       87.    By engaging in the conduct alleged herein the FriendFinder Defendants, and each

19  of them, violated the covenant of Good Faith and Fair Dealing implied in Plaintiff's employment

20  contract.

21       88.    As a direct and proximate result of the breach and/or breaches of Plaintiff's

22  employment contract by the FriendFinder Defendants, and each of them, Plaintiff has suffered

23  damages in an amount to be proved at trial.

24
25               **SEVENTH CAUSE OF ACTION**
                 **Civil Conspiracy**
26    **(By Plaintiff against Defendants FriendFinder, Carmela Monti and Paul Asher)**

27       89.    Plaintiff hereby incorporates by reference all other paragraphs of this Complaint,

28  as though here fully set forth.

27

LAW OFFICES OF
AMANDA METCALF
SAN RAFAEL, CALIFORNIA

COMPLAINT

90. By engaging in the conduct alleged herein, the FriendFinder Defendants, Carmela Monti and Paul Asher, and other FriendFinder employees, agreed and conspired to retaliate against Plaintiff to deprive Plaintiff of her employment and the benefits of her employment contract in retaliation for Plaintiff's complaints about and her refusal to engage in conduct she reasonably believed to be unlawful. After forming the conspiracy Monti and Asher and others employed by FriendFinder performed the acts alleged herein in furtherance of the conspiracy. Monti and Asher, and each of them, and the other FriendFinder employees who participated with them, had actual knowledge of the conspiracy and of the wrongful acts alleged herein and intended that those acts result in depriving Plaintiff of her employment and the benefits of her employment contract in retaliation for plaintiffs complaints and refusal to participate in illegal activity.

91. As a direct and proximate result of the conduct of Monti and Asher, and each of them, and the other FriendFinder employees who participated in their conspiracy, Plaintiff was damaged in an amount to be proved at trial. The conduct of Defendants and each of them, constituted malice, oppression, fraud and/or despicable conduct warranting the imposition of punitive damages.

## EIGHTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
**(By Plaintiff against Defendants FriendFinder, Carmela Monti and Paul Asher)**

92. Plaintiff hereby incorporates by reference all other paragraphs of this Complaint, as though here fully set forth.

93. By engaging in the conduct alleged herein, the FriendFinder Defendants, Carmela Monti and Paul Asher, and each of them, intended to cause Plaintiff emotional distress. The conduct of Defendants, and each of them, was intentional and malicious and done for the purpose of causing Plaintiff to suffer humiliation, mental anguish, and emotional distress.

28

94. As a direct and proximate result of the conduct alleged herein by Defendants, and each of them, plaintiff suffered severe humiliation, mental anguish, and emotional distress in an amount to be proved at trial. The conduct of Defendants and each of them, constituted malice, oppression, fraud and/or despicable conduct warranting the imposition of punitive damages.

## NINTH CAUSE OF ACTION
### Negligent Infliction of Emotional Distress
### (By Plaintiff against Defendants FriendFinder, Carmela Monti and Paul Asher)

95. Plaintiff hereby incorporates by reference all other paragraphs of this Complaint, as though here fully set forth.

96. The FriendFinder Defendants, Carmela Monti and Paul Asher, and each of them, owed a duty to plaintiff to use reasonable care in their dealings with plaintiff and not to expose her any unreasonable risk of harm, or unreasonably expose Plaintiff to the risk that she would suffer mental or emotional injury.

97. In performing the acts alleged herein, the FriendFinder defendants, Carmela Monti and Paul Asher, and each of them, knew or should have known that such conduct constituted, at minimum, a failure to exercise due care in the performance of their duties owed to Plaintiff, and constituted a breach (or breaches) of their duty to refrain from engaging in any conduct that would deprive plaintiff of her employment or prevent or impair the performance of plaintiff's employment contract or constitute a breach of that contract.

98. As a proximate result of the acts or omissions by the above named Defendants, and each of them, as alleged herein, Plaintiff suffered severe emotional distress and mental suffering, all to her damage in an amount to be proved at trial.

## TENTH CAUSE OF ACTION
### Violation of Unfair Competition Statute
### (By Plaintiff against the FriendFinder Defendants)

99. Plaintiff hereby incorporates by reference all other paragraphs of this

29

1  Complaint, as though here fully set forth.

2      100.   The retaliatory conduct alleged herein on the part of the FriendFinder

3  defendants, and each of them, constituted unlawful, unfair or fraudulent business acts or

4  practices prohibited by Business and Professions Code Section 17200, et. seq.

5

6      101.   Plaintiff was injured as a result of the unfair, unlawful or fraudulent retaliatory

7  practices engaged in by the FriendFinder defendants, and has standing to sue and seek relief

8  provided for by California's Unfair Competition statute.

9                         **REQUEST FOR JURY TRIAL**

10

11     102.   Plaintiff requests a jury trial.

12
    WHEREFORE, Plaintiff prays judgment against defendants as follows:
13

14     1.    Compensatory damages;

15     2.    Attorneys' fees and costs of suit

16     3.    Interest, including prejudgment interest;

17     4.    Punitive damages; and

18     5.    Such other and further relief the Court deems proper.

19

20
    Respectfully submitted this 21st day of April, 2009.
21

22

23                         LAW OFFICES OF AMANDA METCALF

24

25

26                         Amanda Metcalf
                           Attorneys for Plaintiff, NATALIE CEDENO
27

28

                                      30

# PENTHOUSE MAGAZINE

October 23, 2007

Ms. Natalie Ordeno
397 Alta Mesa Drive
South San Francisco, CA 94080

Re:     Employment Offer Letter

Dear Natalie:

On behalf of Penthouse Media Group Inc. ("PMGI"), I am pleased to offer you the position of Director of Human Resources with Various, Inc. (the "Company"), reporting directly to the CEO of PMGI or his designee, and based in the Company's Northern California offices (currently located at 443 Sherman Avenue, Suite C, Palo Alto, CA 94300).

1.  **Base salary.** Your base salary for 2007 will be payable bi-weekly at the rate of $5,500 ($143,000 annually). It is anticipated that this salary will be reviewed in January 2008.

2.  **Bonus.** Your bonus will be payable as outlined in Exhibit A, less applicable withholding.

3.  **Equity compensation.** The Company currently intends to implement an employee stock option plan, restricted stock or other equity incentive plan. If and when the Company implements such a plan, you may participate in the manner appropriate to your employment level consistent with the plan's terms, which may be set according to the Company's sole discretion and will govern all details of your participation.

4.  **Benefits and vacation time.** Beginning the first day of employment with the Company, you will continue to be eligible for your current health insurance, dental insurance, disability insurance, life insurance, 401(k) savings and other benefit plans, consistent with the terms of such plans and as set forth in the summary plan documents, or at the option of the Company, for analogous plans sponsored by the Company which shall include benefits no less favorable than those in which you currently participate. Such plans will not be impacted for consideration of any prior existing condition. The Paid Time Off (PTO) system, which provides eligible employees with a "bank" of paid hours, to be used as you deem appropriate, will continue. You will continue to accrue paid time off hours at your rate currently in effect. In your capacity as a Company employee, you will be covered by its "directors & officers" insurance policy pursuant to its terms, as amended from time to time. You will be reimbursed for your reasonable out-of-pocket Company-related expenses (including legal costs, if any) consistent with the Company's Employee Manual or other stated reimbursement policies and procedures.

5.  **Start date.** Your start date shall be the date of closing of the Various, Inc. acquisition by PMGI, and this agreement will be binding on PMGI as of such event. Your orientation will be held during your first week of employment. Your current terms with the Company will be grandfathered with regard to all welfare and benefit programs.

Penthouse Media Group, Inc.
Corporate Office: 6800 Broken Sound Parkway, Suite 100, Boca Raton, FL 33487. 561-912-7000. Fax: 561-912-7039
New York Office: 2 Penn Plaza, Suite 1125, New York, NY 10121. 212-702-6000. Fax: 212-702-6042

Ex. "A"

6.   **Responsibilities.** You will be responsible for the Director of Human Resources function. You will also be responsible for functions and such other duties as may be reasonably assigned by the Company from time to time and consistent with or complementary to your duties as described herein. You will devote all of your professional time, attention, energy and skill to the business and affairs of the Company. You will serve the Company faithfully and diligently to the best of your ability.

7.   **Term.** Your term of employment shall commence on the Start Date and continue for three (3) years; provided that the Company may terminate you for Cause without incurring further liability to you in connection with your employment. "Cause" means (i) a willful failure or refusal on your part to substantially perform your duties under this agreement, the Employee Proprietary Information Agreement, or otherwise imparted by the Company's Employee Manual or other stated policies and procedures; (ii) willful failure or refusal to carry out the lawful directions of your superiors; (iii) willful gross misconduct on your part, including but not limited to theft, violent work-related behavior, violation of the Company's anti-discrimination and anti-harassment policies or repeated acts of gross insubordination; willful dishonesty or fraud in connection with your employment, regardless of whether it results in economic harm to the Company or its subsidiaries or affiliates; indictment or conviction of a crime other than a minor traffic infraction. Cause will only exist under items (i) and (ii) above if such failure continues following a reasonable period after a written demand for substantial performance is delivered to you by the Company, which demand specifically identifies the manner in which the Company believes that you have not substantially performed your duties. For purposes of this agreement, no act or failure to act, on your part shall be deemed "willful" unless done or omitted to be done by you not in good faith, or without belief that your actions were in the best interests of the Company. If you are terminated with Cause, you shall receive only unpaid salary through the date your employment is terminated. Termination for other than cause or resignation by the employee for Good Reason will result in the company continuing to pay the employee his base salary from the date of termination to a date which is three years from the date of the employees Start date; provided that, except as prohibited by state of federal law, you execute and return to the Company a valid and binding release of all other claims, in a form reasonably satisfactory to the Company, related to or arising out of your employment before such pay continuation commences. Good Reason shall mean:

a.   any reduction of your base salary;

b.   the relocation of your base office that is more than fifty (50) miles from the location of your base office as of your start date; or

c.   the failure of the Company to obtain from any Company successor its agreement to assume and perform the terms of this agreement.

8.   **Contingent offer.** This offer is valid until November 12, 2007 and is contingent upon your compliance with the 1986 Immigration Reform and Control Act. The enclosed Employment Eligibility Certification describes acceptable documentation. Please bring verification of your identity and eligibility for employment with you on your first day. This offer of employment is also contingent upon your execution of the Company's Employee Proprietary Information Agreement.

9.    Interference with Business. You acknowledge that, because of your responsibilities at the Company, you have developed and will help to develop, and have been and will be exposed to, the Company's business strategies, information on customers and clients, and other valuable Proprietary Information (as defined in the Employee Proprietary Information Agreement) and trade secrets, and that use or disclosure of such Proprietary Information and trade secrets in breach of this agreement would be extremely difficult to detect or prove. You also acknowledge that the Company's relationships with its employees, customers, clients, vendors, and other persons are valuable business assets. Therefore, you agree as follows:

a.    You shall not, for a period of one (1) year following termination of your employment with the Company for any reason, directly or indirectly solicit, induce, recruit, or encourage any officer, director, or employee of the Company to leave the Company or terminate his or her employment with the Company.

b.    You shall not, for a period of one (1) year following the termination of your employment with the Company for any reason, for the purpose of selling products or services competitive with the Company's, solicit any actual or prospective customer or client of the Company by using the Company's Proprietary Information or trade secrets, or otherwise solicit such customers or clients by using means that amount to unfair competition.

c.    You shall not, following the termination of your employment with the Company for any reason, use the Company's Proprietary Information or trade secrets to interfere with any business relationship or contract between the Company and any of its customers, clients, vendors, business partners, or suppliers.

This agreement shall be governed by the laws of the State of California. Any disputes arising from this agreement shall be brought solely in the state or federal courts located in Palo Alto, California.

Enclosed you will find two copies of this offer of employment. Please contact me as soon as you have reached a decision concerning our offer of employment. Indicate your acceptance of this offer by signing and dating below and returning this signed offer letter to Ms. Carmela Monti via fax at (212) 702-6283. You may keep one copy for your records.

We are very excited about the contributions you can make to the Penthouse Media Group team! Should you have any questions concerning the enclosed information or need additional information, please contact Ms. Carmela Monti at (212) 702-6209.

Sincerely,

PENTHOUSE MEDIA GROUP INC.

Name: Daniel C. Staton          Date: 10/25/07
Title: Chairman

ACKNOWLEDGED AND AGREED

Natalie Costain          Date: 11/9/07

Enclosure (Employment Eligibility Certification)

4

**EXHIBIT A: BONUS PLAN**

This bonus plan commences on your start date and ends on December 31, 2007. This plan in no way guarantees you any future bonuses outside of the agreed upon plan and time frame.

1.  **Bonus Agreement:** You will be awarded a bonus on a quarterly basis. The amount will take two factors into consideration. One is top-line revenue for the current quarter versus the average top-line revenue of the previous two quarters. The second is bottom-line profit for the current quarter versus the average bottom-line profit of the previous two quarters. These two growth rates will be calculated (subtracting 1 from the result so zero growth equals zero in the formula), and your bonus will be equal to "A" plus "B" times top-line growth plus "C" times bottom-line growth. The bonus will not be less than zero. In the event that the Company acquires (or divests) itself of any revenue or profit source, e.g., acquires a business, sells a division of the Company, etc., the new source's revenue and profit will be included (or excluded) in the formula for calculating the bonus.

2.  **Due Date:** You will receive your quarterly bonus within 10 days of the last day of the quarter. The company can prolong the due date an additional 10 days if it is unable to accurately account for that quarter's profit and/or revenue within the 10 days of quarter end.

3.  **Eligibility:** Your employment status is still an "at-will" employment contract. In order to be eligible for your quarterly bonus, you will need to be employed on the last day of the quarter to be deemed eligible for that quarterly payout. Once you are no longer an employee of the Company, this bonus plan is void and is not payable on a prorated basis.

4.  **Withholding Terms:** All bonuses referred to in this letter are subject to reduction of gross earnings to reflect applicable withholding and payroll taxes.

5



**AGREEMENT AND GENERAL RELEASE**

        **Penthouse Media Group, Inc, Various, Inc., Friendfinder Network, Inc.** its parent corporation, affiliates, subsidiaries, divisions, successors and assigns and the employees, officers, directors and agents thereof (collectively referred to throughout this Agreement and General Release ("Agreement") as "Employer"), and **Natalie Cedeno**, her heirs, executors, administrators, successors, and assigns (referred to throughout this Agreement as "Employee") agree that:

        WHEREAS, the parties have agreed to compromise and settle any and all claims or disputes that might be made by Employee arising out of her employment relationship with Employer or the termination of her employment;

        WHEREAS, the parties acknowledge Employee has been paid all accrued wages, rest and meal periods, overtime, severance, bonuses, benefits and has received all payments arising out of her employment relationship with Employer or her termination of employment except as specifically noted below;

        WHEREAS, Employee freely and knowingly, and after due consideration with her attorney, enters into this Agreement intending to waive, settle and release all claims she has or might have against Employer.

        NOW, THEREFORE, in consideration of the mutual promises and covenants hereinafter set forth, the parties agree as follows:

        1.    **Termination of Employment Agreement.** The parties agree that the Employment Agreement between Employee and the Employer dated October 25, 2007 (the "Employment Agreement") will terminate as of **January 29, 2009**, and shall be null and void and of no further force and effect and neither party shall have any further obligation to the other pursuant to the Employment Agreement, except as otherwise specifically provided in this Agreement. Employee and Employer relinquish and forever waive any and all rights in or claims that they now have or may have under the Employment Agreement, except as otherwise specifically provided in this Agreement. Employee represents that with the termination of the Employment Agreement Employee has no other present or future contract or agreement of employment with the Employer, whether written or oral, express or implied.

        2.    **Last Day of Employment.** Employee's last day of employment with Employer is/was January 29, 2009.

        3.    **Consideration.** In exchange for signing this Agreement and General Release and compliance with the promises made herein, Employer agrees to:

        a.    After both parties have signed this Agreement, the revocation period set forth in Paragraph 17 has expired and Employee has not revoked this Agreement, Employer agrees to pay Employee as good and valuable consideration for this Agreement

$Ex\ "B"$

Employee's base salary of $143,000.00 paid semimonthly, less all applicable federal, state and local withholding taxes and deductions, through the Employer's normal payroll cycle starting on February 15, 2009 and ending on December 7, 2010. The Parties stipulate that December 7, 2010 represents three years from the date Employee started working under the Employment Agreement dated October 25, 2007 (the "Sum");

        b.    If Employee elects to continue medical and dental coverage under the Employer's plan in accordance with the continuation requirements of COBRA, Employer shall reimburse for the cost of said coverage beginning on the last day of employment and ending on July 29, 2010, a period of approximately 18 months. Thereafter, Employee shall be entitled to elect to continue such COBRA coverage for the remainder of the COBRA period, at Employee's own expense. Employee agrees that, if Employee becomes eligible for health insurance coverage pursuant to new employment, Employee will immediately notify Employer and Employer's obligation to pay the COBRA premiums during the 18 month period pursuant to this paragraph shall cease at that time.

        4.    **No Consideration Absent Execution of this Agreement.** Employee understands and agrees that Employee would not receive the benefits specified in paragraph 3 above, except for Employee's execution of this Agreement, the revocation period set forth in Paragraph 17 has expired, Employee has not revoked this Agreement and the fulfillment of the promises contained herein.

        5.    **General Release of Claims.** Employee, on behalf of herself, her spouse, heirs, executors, administrators, conservators and assigns knowingly and voluntarily releases and forever discharges, to the full extent permitted by law, **Penthouse Media Group, Inc., Various, Inc., Friendfinder Network, Inc.,** and its affiliates, subsidiaries, divisions, insurers, predecessors, successors and assigns, and the current and former employees, officers, directors and agents thereof (collectively referred to as "Released Parties"), of and from any and all claims, known and unknown, asserted and unasserted, Employee has or may have against the Released Parties as of the date of execution of this Agreement including, but not limited to, any alleged violation of:

*1* •     Title VII of the Civil Rights Act of 1964, as amended;

*2* •     The Civil Rights Act of 1991, as amended;

*3* •     Sections 1981 through 1988 of Title 42 of the United States Code, as amended;

*4* •     The Employee Retirement Income Security Act of 1974, as amended;

*5* •     The Immigration Reform and Control Act, as amended;

*6* •     The Americans with Disabilities Act of 1990, as amended;

*7* •     The Age Discrimination in Employment Act of 1967, as amended; the Older Worker Benefit Protection Act, as amended;

8. • The Workers Adjustment and Retraining Notification Act, as amended;

9. • The Occupational Safety and Health Act, as amended;

10. • The Sarbanes-Oxley Act of 2002, as amended;

11. • California Family Rights Act – Cal. Gov't Code § 12945.2 et seq., as amended;

12. • California Fair Employment and Housing Act – Cal. Gov't Code § 12900 et seq., as amended;

13. • California Unruh Civil Rights Act – Cal. Civ. Code § 51 et seq., as amended;

14. • California Sexual Orientation Bias Law – Cal. Lab. Code § 1101 et seq., as amended;

15. • Statutory Provisions Regarding the Confidentiality of AIDS Information – Cal. Health & Safety Code § 120775 et seq., as amended;

16. • California Confidentiality of Medical Information – Cal. Civ. Code § 56 et seq., as amended;

17. • California Smokers' Rights Law – Cal. Lab. Code § 96, as amended;

18. • California Parental Leave Law – Cal. Lab. Code § 230.7 et seq., as amended;

19. • California Apprenticeship Program Bias Law – Cal. Lab. Code § 3070 et seq., as amended;

20. • California Wage Payment Act, as amended, and Cal. Lab. Code, as amended;

21. • California Equal Pay Law – Cal. Lab. Code § 1197.5 et seq., as amended;

22. • California Whistleblower Protection Law – Cal. Lab. Code § 1102-5(a) to (c), as amended;

23. • California Military Personnel Bias Law – Cal. Mil. & Vet. Code § 394 et seq., as amended;

24. • Statutory Provision Regarding California Family and Medical Leave – Cal. Lab. Code § 233, as amended;

25. • California Parental Leave for School Visits Law – Cal. Lab. Code § 230.7 et seq., as amended;

26 • Statutory Provisions Regarding California Electronic Monitoring of Employees – Cal. Lab. Code § 435 et seq., as amended;

27 • The California Occupational Safety and Health Act, as amended, California Labor Code § 6300 et seq., and any applicable regulations thereunder;

28 • California Consumer Reports: Discrimination Law – Cal. Civ. Code § 1786.10 et seq., as amended;

29 • California Political Activities of Employees Act – Cal. Lab. Code § 1101 et seq., as amended;

30 • California Domestic Violence Victim Employment Leave Act – Cal. Lab. Code §230.1, as amended;

31 • California Voting Leave Law – Cal. Elec. Code § 14350 et seq., as amended;

32 • California Court Leave Law – Cal. Lab. Code § 230, as amended;

33 • Los Angeles AIDS-Based Discrimination Ordinance, Los Angeles Municipal Ordinance §45.80 et seq., as amended;

34 • Any other federal, state or local civil or human rights law or any other local, state or federal law, regulation or ordinance;

35 • Any public policy, contract, tort, or common law; or

36 • Any claim for costs, fees, or other expenses including attorneys' fees incurred in these matters.

   This Agreement **does not extend** to those rights which as a matter of law cannot be waived, including but not limited to unwaivable rights Employee may have under the California Labor Code such as rights to reimbursement or indemnity under Labor Code § 2802, nor does this Agreement affect any right Employee may have to receive workers' compensation benefits, unemployment benefits pursuant to the California Unemployment Insurance Code or State Disability insurance benefits

   6.   **Waiver of California Civil Code section 1542.**  To effect a full and complete general release as described above, Employee expressly waives and relinquishes all rights and benefits of section 1542 of the Civil Code of the State of California, and Employee does so understanding and acknowledging the significance and consequence of specifically waiving section 1542. Section 1542 of the Civil Code of the State of California states as follows:

   A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time

8.    **Health and Welfare Benefits.** Employee understands and agrees that her right to benefits under the Employer's health and welfare benefit program, if any, shall be limited to those set forth in the Consolidated Omnibus Budget Reconciliation Act of 1986 ("COBRA").

9.    **Return of Company Property/Confidential and Trade Secret Information.**

9.1    "Confidential Information" means any information of or about the Released Parties, its clients or customers, other than Trade Secrets, which is not generally known to others and from which the Released Parties or its clients or customers derive actual or potential economic value because such information is generally not known to others. Confidential Information includes, but is not limited to:  sales and marketing information, customer account records, training and operations materials and memoranda, personnel records, pricing and financial information relating to the business accounts, customers, employees and affairs of the Released Parties, present and future business plans, and other similar information which is treated as "Confidential" by the Released Parties but does not rise to the level of a Trade Secret. "Trade Secret" means Released Parties' information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Employee agrees that, in the course of her employment with Released Parties, she has acquired Confidential Information and Trade Secrets as defined above. Employee understands and agrees that such information has been disclosed to Employee in confidence and for use only by Released Parties. Employee understands and agrees that for a period of one (1) years after Employee's employment with Released Parties:  (i) Employee will keep such Confidential Information confidential, (ii) Employee will not disclose or communicate Confidential Information to any third party, and (iii) Employee will not make use of Confidential Information on Employee's own behalf, or on behalf of any third party. After the end of Employee's employment with Released Parties, Employee understands and agrees that Employee will not use Released Parties' Trade Secrets on Employee's own behalf, or on behalf of any third party and Employee will not disclose or communicate such Trade Secrets to any third party for as long as such Trade Secret information, including a formula, pattern, compilation, program, device, method, technique, or process remains a Trade Secret of Released Parties as defined by law.

Employee understands and agrees that for a period of one (1) years after Employee's employment with Released Parties Employee will not directly or indirectly solicit or recruit any officer, director, manager or employee of Released Parties to leave their employment with Released Parties for another employer.

9.2 Employee acknowledges that Employee has returned to Released Parties all company information and property including and without limitation the following: reports, data, plans, projects, files, memoranda, and records and software; credit cards, cardkey passes; door and file keys; safe combinations; computer access codes; disks and instructional or personnel manuals; and other physical or personal property which Employee received or prepared or

helped to prepare in connection with her employment with Employer. Employee represents and agrees that Employee has not retained and will not retain any copies, duplicates, reproductions, or excerpts thereof.

## 10. Confidentiality.

10.1 Employee (including Employee's current spouse) agrees that Employee will not publicize or disclose or cause or knowingly permit or authorize the publicizing or disclosure of the fact of this Agreement, the contents of this Agreement or of the negotiations leading up to it, or of the basis for any claims or allegations which were or could have been made against Released Parties that concern or are within the scope of this Agreement to any person, firm, organization or entity of any and every type, public or private, for any reason, at any time, without the prior written consent of Released Parties.

10.2 Employee is permitted, however, to make confidential disclosures, as required to Employee's current spouse, accountants, attorneys, or to governmental taxing authorities. Employee understands this pledge of confidentiality is an integral part of Employer's agreement to settle this matter on the basis referred to herein. If Employee discloses the dollar amounts, the terms of this Agreement or the fact of settlement, it will only be after he has informed the disclosee about this confidentiality clause, has instructed them to keep said information in the strictest confidence, and they have agreed in writing they will not disclose any of the information. In response to inquiries from third parties concerning the status of her separation, Employee will state only that **"it has been resolved"** without further elaboration.

10.3 Employee agrees that if Employee's spouse, attorneys, or accountant disclose the dollar amounts or any terms of this Agreement as prohibited herein, such disclosure will be considered Employee's disclosure and a breach of the terms of this paragraph 10.

11. **Nondisparagement.** Employee agrees that Employee shall not, directly or indirectly, in public or private, deprecate, impugn, disparage, or make any remarks that would tend to or be construed to tend to defame any of the Released Parties, nor shall Employee assist any other person, firm or company in so doing.

12. **Future Cooperation.** With respect to any threatened, pending or future litigations, administrative or arbitration proceedings, investigations, or other legal proceedings (as well as demands or asserted claims) involving any subject related to Released Parties and/or any aspect of Employee's employment about which Employee possesses relevant knowledge, Employee agrees to cooperate fully with Released Parties in preparing for such proceedings and/or the defense of any current or former officers, directors, trustees, administrators, executors, agents, employees, successors or assigns who are involved in such proceedings, and in appearing as a witness at trial, deposition, hearing or any other forum. Employee agrees her cooperation pursuant to this Paragraph will continue for all matters filed or initiated within three (3) years following her execution of this Agreement and General Release. To the extent Employee incurs any reasonable expenses with respect to such participation she will be reimbursed by Employer.

13. **Governing Law and Interpretation.** This Agreement shall be governed and conformed in accordance with the laws of the state of California without regard to its

conflict of laws provision. In the event the Employee or Employer breaches any provision of this Agreement, Employee and Employer affirm that either may institute an action to specifically enforce any term or terms of this Agreement. Should any provision of this Agreement be declared illegal or unenforceable by any court of competent jurisdiction and cannot be modified to be enforceable, excluding the general release language, such provision immediately shall become null and void, leaving the remainder of this Agreement in full force and effect.

14. **Nonadmission of Wrongdoing.** The Parties agree that neither this Agreement nor the furnishing of the consideration for it shall be deemed or construed at anytime for any purpose as an admission by Released Parties of any liability or wrongful conduct of any kind.

15. **Amendment.** This Agreement may not be modified, altered or changed except upon express written consent of both parties wherein specific reference is made to this Agreement.

16. **Miscellaneous.**

16.1 Employee acknowledges that, except as expressly set forth in this Agreement, no representations of any kind have been made to Employee, by Employer, or by any of its agents, officers, employees, representatives, or attorneys, to induce her execution of this document. Employee further states that the only representations made in order to obtain Employee's consent to this Agreement are stated above, that the contents of this document have been explained to Employee in full and that she is signing this agreement voluntarily.

16.2 The Parties represent that they were represented by or had the opportunity to be represented by counsel of their own choosing in the negotiations leading to and the preparation of this Agreement, that they are fully aware of its contents and legal effect, and that they freely and voluntarily enter into it without coercion, intimidation or threat of retaliation.

16.3 This Agreement shall be binding upon each Party and upon each Party's heirs, administrators, representatives, executors, successors and assigns, and shall inure to the benefit of the other Party and each of them, and to each Party's heirs, administrators, representatives, executors, successors and assigns.

16.4 In the event it shall be necessary for any Party to institute legal action to enforce any of the terms and conditions or provisions of this Agreement, or for any breach thereof, the prevailing Party in such action shall be entitled to costs and reasonable attorneys' fees.

16.5 This Agreement may be executed in counterparts, each to constitute an original. Originals of this Agreement will be provided to Employer and Employee.

17. **Revocation.** Employee may revoke this Agreement and General Release for a period of **seven (7) calendar days** following the day he executes this Agreement and General Release. Any revocation within this period must be submitted, in writing, to Carmela Monti Vice President, Human Resources and state, "I hereby revoke my acceptance of our

Agreement and General Release." The revocation must be personally delivered to Carmela Monti, Vice President Human Resources or her designee, or mailed to Carmela Monti, Vice President Human Resources, FriendFinder Networks Inc. 20 Broad Street 14th Floor, New York, NY 10005 and postmarked within seven (7) calendar days of execution of this Agreement and General Release. This Agreement and General Release shall not become effective or enforceable until the revocation period has expired and Employee has not revoked the Agreement within the seven (7) day period. If the last day of the revocation period is a Saturday, Sunday, or legal holiday in the state in which Employee was employed at the time of her last day of employment, then the revocation period shall not expire until the next following day which is not a Saturday, Sunday, or legal holiday.

18. **Entire Agreement.** This Agreement sets forth the entire agreement between the parties hereto, and fully supersedes any prior obligation of the Employer to the Employee. Employee acknowledges that Employee has not relied on any representations, promises, or agreements of any kind made to Employee in connection with Employee's decision to accept this Agreement, except for those set forth in this Agreement.

AS STATED IN PARAGRAPH 17 ABOVE, EMPLOYEE MAY REVOKE THIS AGREEMENT AND GENERAL RELEASE FOR A PERIOD OF SEVEN (7) CALENDAR DAYS FOLLOWING THE DAY EMPLOYEE EXECUTES THIS AGREEMENT AND GENERAL RELEASE. ANY REVOCATION WITHIN THIS PERIOD MUST BE SUBMITTED, IN WRITING, TO CARMELA MONTI, VICE PRESIDENT HUMAN RESOURCES AND STATE, "I HEREBY REVOKE MY ACCEPTANCE OF OUR AGREEMENT AND GENERAL RELEASE." THE REVOCATION MUST BE PERSONALLY DELIVERED TO CARMELA MONTI, VICE PRESIDENT HUMAN RESOURCES OR HER DESIGNEE, OR MAILED TO CARMELA MONTI, VICE PRESIDENT HUMAN RESOURCES FRIENDFINDER NETWORKS, INC. 20 BROAD STREET 14TH FLOOR, NEW YORK, NY 10005 AND POSTMARKED WITHIN SEVEN (7) CALENDAR DAYS OF EXECUTION OF THIS AGREEMENT AND GENERAL RELEASE.

EMPLOYEE IS HEREBY ADVISED THAT EMPLOYEE HAS UP TO TWENTY-ONE (21) CALENDAR DAYS TO REVIEW THIS AGREEMENT AND GENERAL RELEASE AND TO CONSULT WITH AN ATTORNEY PRIOR TO EXECUTION OF THIS AGREEMENT AND GENERAL RELEASE.

EMPLOYEE AGREES THAT ANY MODIFICATIONS, MATERIAL OR OTHERWISE, MADE TO THIS AGREEMENT AND GENERAL RELEASE DO NOT RESTART OR AFFECT IN ANY MANNER THE ORIGINAL TWENTY-ONE (21) CALENDAR DAY CONSIDERATION PERIOD.

HAVING ELECTED TO EXECUTE THIS AGREEMENT AND GENERAL RELEASE, TO FULFILL THE PROMISES AND TO RECEIVE THE SUMS AND BENEFITS IN PARAGRAPH "3" ABOVE, EMPLOYEE FREELY AND KNOWINGLY, AND AFTER DUE CONSIDERATION, ENTERS INTO THIS AGREEMENT AND

**GENERAL RELEASE INTENDING TO WAIVE, SETTLE AND RELEASE ALL CLAIMS EMPLOYEE HAS OR MIGHT HAVE AGAINST RELEASED PARTIES.**

IN WITNESS WHEREOF, the parties hereto knowingly and voluntarily executed this Agreement and General Release as of the date set forth below:

EMPLOYEE

Dated: _____          _____
                              **Natalie Cedeno**

EMPLOYER

Dated: _____          _____
                              Authorized Agent of Penthouse Media Group, Inc,
                              Various, Inc., Friendfinder Network, Inc.

## Exhibit A

### FriendFinder Networks Inc. 2008 Stock Option Plan

702138v8 011089.0105

# FRIENDFINDER NETWORKS INC.

## STOCK OPTION AGREEMENT

STOCK OPTION AGREEMENT (this "Agreement"), dated as of July 7, 2008 (the "Grant Date"), between FriendFinder Networks Inc., a Nevada corporation (the "Company") and Natalie Cedeno ("Participant").

WHEREAS, Participant is currently an employee of the Company; and

WHEREAS, the Company desires to grant to Participant an option to purchase shares of Common Stock, $0.01 par value per share, of the Company ("Common Stock") in the amount, and subject to the terms and conditions, set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements herein contained, intending to be legally bound hereby, the parties hereto agree as follows:

1.    Grant of Option.

    (a)    The Company hereby grants to Participant an option (the "Option") to purchase   50,000   shares (the "Shares") of Common Stock at a per-Share purchase price equal to the per-Share price offered to the public at the time of an IPO (the "Exercise Price"). The Company shall cause certificates for any Shares purchased pursuant to the exercise of any portion of this option to be delivered to Participant upon payment of the Exercise Price in full, all subject to the terms and conditions hereinafter set forth. The Option granted hereby is intended as an incentive stock option and is intended to comply with Section 409(A) of the Code.

    (b)    The Option granted to Participant pursuant to this Agreement is granted pursuant to the FriendFinder Networks Inc. 2008 Stock Option Plan (the "Plan"), a true and correct copy of which is attached hereto as Exhibit A. The provisions of the Plan are incorporated herein by reference. Unless otherwise defined in this Agreement, capitalized terms used in this Agreement shall have the meaning set forth in the Plan.

2.    Vesting. Subject to Section 3(b) below, this Option shall vest to the extent of twenty percent (20%) on the first anniversary of the date hereof and an additional twenty percent (20%) on each of the succeeding four anniversaries of the date hereof (each vesting date specified therein is hereafter referred to as a "Vesting Date"); provided, however, that the Participant may exercise the vested portion of the Option only after that date which is 18 months after the date of an IPO (such date being hereinafter called the "Effective Date").

3.    Term and Termination.

    (a)    This Option shall expire on the date that is ten (10) years from the Grant Date (the "Expiration Date"); provided, that:

    (i)    if Participant's employment is terminated for cause or by Participant's resignation, the entire portion of this Option not theretofore exercised shall terminate effective as of the date of termination;

702138v8 011089.0105

(ii)     if Participant's employment is terminated as a result of the death of Participant, this Option may be exercised, to the extent vested on the date of Participant's death, by Participant's Designated Beneficiary (or, if none has been effectively designated, by his or her executor, administrator or person to whom his or her rights under the Option shall pass by will or by the laws of descent and distribution) at any time prior to the earlier of (i) the date that is three months after death and (ii) the Expiration Date; and

(iii)     if Participant's employment is terminated for any reason other than by the Company for cause, Participant's resignation or Participant's death this Option may be exercised, to the extent vested on the effective date of termination of Employment, at any time prior to the earlier of (i) the date that is three months after the effective date of termination and (ii) the Expiration Date. Without limiting the generality of the foregoing, if Participant is permanently and totally disabled (within the meaning of section 105(d)(4), or any successor section, of the Code), this Option may be exercised, to the extent vested on the date of disability, by Participant (or his or her legal representative) at any time prior to the earlier of (i) the date that is three months after the date of such disability and (ii) the Expiration Date.

(b)     Participant may exercise all or part of this Option at any time before its expiration pursuant to Section 3(a), but only to the extent that this Option had become exercisable for vested shares on the exercise date.   Upon termination of Participant's Employment for any reason, this Option shall expire immediately with respect to the number of Shares for which this Option is not yet exercisable.  In the event that the Participant dies after termination of Employment but before the earlier of (i) the date that is three months after the effective date of termination and (ii) the Expiration Date, all or part of this Option may be exercised (prior to the Expiration Date) by the Participant's Designated Beneficiary (or, if none has been effectively designated, by his or her executor, administrator or person to whom his or her rights under the Option shall pass by will or by the laws of descent and distribution).

(c)     Nothing contained in this Agreement shall limit or be deemed to limit the Company's rights to terminate the Participant's Employment.

4.     No Transfer of Option.  This Option may not be transferred by the Participant except by will or the laws of descent and distribution. This Option may not be exercised during the Participant's lifetime except by the Participant. The term "transfer" shall include assign, dispose, pledge or hypothecate whether by operation of law or otherwise, or be made subject to sale under execution, attachment or similar process of this Option or any right or interest in this Option. Any attempted transfer or other disposition of this Option contrary to the provisions hereof, and the levy of any execution, attachment or similar process upon this Option, shall be null and void and without effect.

5.     Payment of Exercise Price and Tax Withholding.  On the date of the exercise of this Option, payment of the Exercise Price for the number of Shares with respect to which this Option is being exercised shall be made to the Company at the Company's principal office, and shall be made at the option of the Participant (i) in cash or by personal or certified check, (ii) by delivery of Common Stock certificates (in negotiable form) representing shares of Common Stock (not subject to limitations on transfer) having a Fair Market Value equal to the aggregate Exercise Price of the shares of Common Stock with respect to which this Option is being

exercised, (iii) through net exercise, using shares of Common Stock to be acquired upon exercise of this option, such shares of Common Stock being valued at their Fair Market Value on the date of exercise, or (iv) through such other form of consideration as is deemed acceptable by the Committee. If the Participant does not make a choice as to the above, the exercise will be through net exercise using shares of Common Stock to be acquired upon exercise of this Option against payment of the exercise price and any withholding taxes due. In addition and at the time of exercise, as a condition of delivery of the Common Stock, the Participant shall remit to the Company all required federal, state and local withholding tax amounts in the manner determined by the Committee.

6.     Investment Representation. Upon the exercise of this Option at a time when there is not in effect a registration statement under the Securities Act of 1933, as amended, relating to the Shares subject to this Option, the Participant hereby represents and warrants, and by virtue of such exercise shall be deemed to represent and warrant, to the Company that such Shares shall be acquired for investment and not with a view to the distribution thereof, and not with any present intention of distributing the same, and the Participant shall provide the Company with such further representations and warranties as the Company may require in order to ensure compliance with applicable federal and state securities, blue sky and other laws.

7.     Limitations on Exercise of Option. This Option shall not be exercisable, and no shares of Common Stock subject to this Option shall be purchased upon the exercise of this Option, unless and until the Company and the Participant shall have complied with all applicable federal or state registration, listing and qualification requirements and all other requirements of law or of any regulatory agencies having jurisdiction, unless the Committee has received evidence satisfactory to it that the Participant may acquire such shares pursuant to an exemption from registration under the applicable securities laws. Any determination in this connection by the Committee shall be final, binding and conclusive. The Company reserves the right to legend any certificate for shares of Common Stock, conditioning sales of such shares upon compliance with applicable federal and state securities laws and regulations.

8.     No Rights as Common Stockholder. The Participant shall not be, nor shall a transferee of an Participant be, nor have any of the rights or privileges of, a holder of Common Stock in respect of any Shares purchasable upon the exercise of any part of this Option unless and until certificates representing such shares shall have been issued by the Company to such holder. No adjustments shall be made, except as provided in Section 9 below, nor shall the Company have any obligation to issue any dividends or otherwise afford any rights to which shares of Common Stock are entitled, until the date of the issuance to the Participant of such certificates.

9.     Adjustments. If at any time while this Option is outstanding, the number of outstanding shares of Common Stock is changed by reason of a reorganization, recapitalization, Common Stock split or any of the other events described in Section 9 of the Plan, the number and kind of shares of Common Stock subject to this Option, and/or the exercise price of such shares, shall be adjusted in accordance with Section 9 of the Plan.

702138v8 0110#9.0105

10.    <u>Prohibition Against Retention And Use Of Confidential Information</u>. Participant recognizes and agrees that any proprietary, secret or confidential information of Company including, without limitation, knowledge or information relating to its trade secrets, business methods, the names or requirements of its customers or clients or the terms of any contract or other agreement between the Company and third parties, to the extent that the same are not available to the public as a result of any action on Participant's part, are and will be of great value to Company and shall at all times be kept confidential ("<u>Confidential Information</u>"). To ensure that employees do not improperly use Confidential Information to compete against the Company upon termination of employment, Participant agrees as follows:

(a)    <u>Return Of Confidential Information</u>. Upon termination of Participant's employment with the Company, Participant shall promptly deliver or return to Company, and shall not retain any copies of, all Confidential Information in Participant's possession, custody or control.

(b)    <u>Non-Solicitation Of Employees</u>. Participant shall not, for one year following termination of employment for any reason, directly or indirectly solicit, or directly or indirectly participate in the solicitation of, any employee of the Company to leave his or her employment or to accept employment with any other person or entity. As used in this paragraph, the term "participate" shall mean: identifying employees to be hired, providing input concerning the competency of the Company's employees, participating in any employer's interview or selection process with respect to any employee of the Company, and providing any Confidential Information concerning any employee of the Company to any person.

(c)    <u>Non-Solicitation Of Clients Using Confidential Information</u>. Participant further agrees that, for the one year period following termination for any reason, Participant shall not directly or indirectly solicit the business of, or perform any services for, any actual or prospective client of the Company as to whom Participant had access to Confidential Information during the course of Participant's employment with the Company. Participant further agrees that, during this one year period, Participant shall not encourage or assist any other person or entity to solicit or provide services to any client of the Company covered by this section, and shall not otherwise seek to encourage or induce any such client to cease doing business with, or lessen its business with, the Company.

(d)    <u>Covenant Not To Compete By Use Of The Company's Confidential Information</u>. Participant further agrees that, during the term of this Agreement, and at any time after the termination of this Agreement for any reason, Participant shall not engage in competition with the Company while making use of the Company's Confidential information.

(e)    <u>Reasonableness</u>. Participant agrees that each provision of this Section 10 is reasonable and necessary for the protection of the Company; that each such provision is and is intended to be divisible; that if any such provision (including any sentence, clause or part) shall be held contrary to law or invalid or unenforceable in any respect in any jurisdiction, or as to any one or more periods of time, areas or business activities, or any part thereof, the remaining provisions shall not be affected but shall remain in full force and effect as to the other and remaining parts; and that any invalid or unenforceable provision shall be deemed, without further action on the part of the parties hereto, modified, amended and limited to the extent necessary to

702138v4 011089.0105

render the same valid and enforceable in such jurisdiction. Participant further recognizes and agrees that any violation of any of his or her agreements in this Section 10 would cause such damage or injury to the Company as would be irreparable and the exact amount of which would be impossible to ascertain and that, for such reason, among others, the Company shall be entitled, as a matter of course, to injunctive relief from any court of competent jurisdiction restraining any further violation, and that the Company shall not be required to post any bond or other security in connection with such injunctive relief. Such right to injunctive relief shall be cumulative and in addition to, and not in limitation of, all other rights and remedies which the Company may possess.

(f)     Survival. The provisions of this Section 10 shall survive the expiration or termination of this Agreement for any reason.

11.     Notices. Any notice hereunder by the Participant shall be given to the Company in writing and such notice shall be deemed duly given only upon receipt thereof at the Company's offices. Any notice hereunder by the Company shall be given to the Participant in writing and such notice shall be deemed duly given only upon receipt thereof at such address as the Participant may have on file with the Company.

12.     Terms of Plan. This Agreement shall be subject to all of the terms and conditions of the Plan. If there is any conflict between the terms of this Agreement and the terms of the Plan, the terms of the Plan shall control.

13.     Construction. The interpretation of this Agreement is vested in the Committee, and the Committee's interpretation shall be final and conclusive.

14.     Governing Law. This Agreement shall be construed and enforced in accordance with the laws of the State of Florida, without giving effect to the choice of law principles thereof.

15.     Disclosure Regarding Maximum Amount of Incentive Stock Option Grant. In accordance with Section 422(d) of the Code and Section 12 of the Plan, Participant hereby acknowledges that for federal income tax purposes this Option shall be treated as an incentive stock option only to the extent that the aggregate Fair Market Value of Common Stock (determined as of the date of grant) with respect to which this Option is exercisable for the first time by the Participant during any calendar year is equal to or less than $100,000, and otherwise shall be treated as a non-qualified stock option. The Participant is advised to consult with his or her individual tax advisor to review the tax consequences of this limitation.

*Signature page follows.*

702138v8 011089.0105

## <u>VERIFICATION</u>

I, NATALIE CEDENO, declare that I am the Plaintiff in the attached Complaint.

I have read the attached Complaint and know the contents thereof to be true, except for

those matters which are alleged on information and belief, and as to those matters, I

believe them to be true.

I declare under penalty of perjury, under the laws of the State of California, that

the foregoing is true and correct.

Dated: 4/21/09                              NATALIE CEDENO

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | **FILED** FOR COURT USE ONLY |
|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
Amanda Metcalf
Law Offices of A. Metcalf
29 Marin Bay Park Court
San Rafael, CA. 94901
TELEPHONE NO.: 415-454-0945     FAX NO.: 415-454-9895
ATTORNEY FOR *(Name):* Plaintiff, Natalie Cedeno

**FILED**

APR 22 2009

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  Santa Clara
STREET ADDRESS: 191 First Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Jose, CA. 95113
BRANCH NAME:

CASE NAME:
Natalie Cedeno v. FriendFinder Networks, Inc., et al

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [✓] Unlimited  [ ] Limited (Amount demanded exceeds $25,000) (Amount demanded is $25,000 or less) | [ ] Counter  [ ] Joinder  Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | **1 0 9 C V 1 4 0 6 2 8** JUDGE: DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[✓] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

BY FAX

2. This case [ ] is  [✓] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
a. [ ] Large number of separately represented parties
b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
c. [ ] Substantial amount of documentary evidence
d. [ ] Large number of witnesses
e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a.[✓] monetary   b.[ ] nonmonetary; declaratory or injunctive relief   c.[✓] punitive
4. Number of causes of action *(specify):* Ten
5. This case [ ] is  [✓] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: April 21, 2009
Amanda Metcalf, ESQ.
(TYPE OR PRINT NAME)                          (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use Judicial Council of California CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740; Cal. Standards of Judicial Administration, std. 3.10 www.courtinfo.ca.gov American LegalNet, Inc. |
|---|---|---|

# CIVIL LAWSUIT NOTICE

CASE NUMBER: _____ **1 0 9 C V 1 4 0 6 2 8**

**Superior Court of California, County of Santa Clara**
**191 N. First St., San Jose, CA 95113**

---

## PLEASE READ THIS ENTIRE FORM

---

**PLAINTIFF** (the person suing): Within 60 days after filing the lawsuit, you must serve each Defendant with the *Complaint, Summons,* an *Alternative Dispute Resolution (ADR) Information Sheet,* and a copy of this *Civil Lawsuit Notice,* and you must file written proof of such service.

---

**DEFENDANT** (The person sued): **You must do each of the following to protect your rights:**

1. You must file a **written response** to the *Complaint, using the proper legal form or format,* in the Clerk's Office of the Court, within **30 days** of the date you were served with the *Summons* and *Complaint ;*
2. You must have an adult other than yourself personally deliver or mail a copy of your written response to Plaintiff's attorney, or to Plaintiff if Plaintiff has no attorney; and
3. You must attend the first Case Management Conference.

   Warning: If you, as the Defendant, do not follow these instructions, you may automatically lose this case.

---

**RULES AND FORMS:** You must follow the California Rules of Court and the Superior Court of California, County of Santa Clara Local Civil Rules and use proper forms. You can obtain legal information, view the rules and receive forms, free of charge, from the Self-Help Center at 99 Notre Dame Avenue, San Jose (408-882-2900 x-2926), www.scselfservice.org (Select "Civil") or from:

- State Rules and Judicial Council Forms: www.courtinfo.ca.gov/forms and www.courtinfo.ca.gov/rules
- Local Rules and Forms: http://www.sccsuperiorcourt.org/civil/rule1toc.htm

---

**CASE MANAGEMENT CONFERENCE (CMC):** You must meet with the other parties and discuss the case, in person or by telephone, at least 30 calendar days before the CMC. You must also fill out, file and serve a *Case Management Statement* (Judicial Council form CM-110) at least 15 calendar days before the CMC.

*You or your attorney must appear at the CMC. You may ask to appear by telephone – see Local Civil Rule 8.*

---

*Your Case Management Judge is:* Honorable Mary Jo Levinger _____ *Department:* __5__

*The 1st CMC is scheduled for:* (Completed by Clerk of Court)

Date: **SEP 1 5 2009** Time: 2:15pm in Department: 5

*The next CMC is scheduled for:* (Completed by party if the 1st CMC was continued or has passed)

Date: _____ Time: _____ in Department _____

---

**ALTERNATIVE DISPUTE RESOLUTION (ADR):** If all parties have appeared and filed a completed *ADR Stipulation Form* (local form CV-5008) at least 15 days before the CMC, the Court will cancel the CMC and mail notice of an ADR Status Conference. Visit the Court's website at www.sccsuperiorcourt.org/civil/ADR/ or call the ADR Administrator (408-882-2100 x-2530) for a list of ADR providers and their qualifications, services, and fees.

**WARNING:** Sanctions may be imposed if you do not follow the California Rules of Court or the Local Rules of Court.

---

**CIVIL LAWSUIT NOTICE**

# EXHIBIT 2

FILED

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): <br> Amanda Metcalf, 57177 <br> LAW OFFICE OF AMANDA METCALF <br> 29 Marin Bay Park Ct <br> San Rafael, CA 94901 <br>     TELEPHONE NO.: (415) 454-0945 <br> ATTORNEY FOR (Name): Plaintiff | FOR COURT USE ONLY <br> MAY 6 2009 <br> David H. Yamasaki, Chief Exec. Officer/Clerk Superior Court <br> County of Santa Clara, California <br> By_____ Deputy Clerk <br><br> J. Cao-Nguyen |
|---|---|
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF <br> Superior Court of California, Santa Clara County <br> 191 N. First Street <br> San Jose, CA 95113-1090 | |
| PLAINTIFF/PETITIONER: Natalie Cedeno <br><br> DEFENDANT/RESPONDENT: FriendFinder Networks, Inc., et al | CASE NUMBER: <br> 109 CV 140628 |
| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.: <br> none |

**BY FAX**

1. At the time of service I was a citizen of the United States, at least 18 years of age and not a party to this action.

2. I served copies of: Civil Case Cover Sheet, Summons, Complaint, complaint signature page, Exhibit A, Exhibit B

3. a. Party served: Carmela Monti

   b. Person Served: party in item 3a

4. Address where the party was served: 20 Broad Street 14th Floor
   New York, NY 10005

5. I served the party
   a. by personal service. I personally delivered the documents listed in item 2 to the party or person authorized to
   receive service of process for the party (1) or (date): 5/5/2009     (2) at (time): 9:40 AM

6. The "Notice to the Person Served" (on the summons) was completed as follows:

   a. as an individual defendant.

7. Person who served papers
   a. Name:     Robert Lawson
   b. Address:   One Legal - 194-Marin
             504 Redwood Blvd #223
             Novato, CA 94947
   c. Telephone number: 415-491-0606

   d. The fee for service was: $ 229.00
   e. I am:
     (1) Not a registered California process server.

8. I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Date: 5/5/2009

Robert Lawson
(NAME OF PERSON WHO SERVED PAPERS)

(SIGNATURE)

Form Adopted for Mandatory Use <br> Judicial Council of California POS-010 <br> [Rev. Jan 1, 2007]

**PROOF OF SERVICE OF SUMMONS**

Code of Civil Procedure, § 417.10

OL# 1756381

# EXHIBIT 3

POS-010

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State bar number, and address)*:
Amanda Metcalf, 57177
LAW OFFICE OF AMANDA METCALF
29 Marin Bay Park Ct
San Rafael, CA 94901
TELEPHONE NO.: (415) 454-0945
ATTORNEY FOR *(Name)*: Plaintiff

FILED

2009 MAY -4 /PM 1: 42

David H. _____ Superior Court
_____ zona
By _____
_____ G. Duarte

SUPERIOR COURT OF CALIFORNIA, COUNTY OF
Superior Court of California, Santa Clara County
191 N. First Street
San Jose, CA 95113-1090

PLAINTIFF/PETITIONER: Natalie Cedeno

DEFENDANT/RESPONDENT: FriendFinder Networks, Inc., et al.

| CASE NUMBER: |
|---|
| 109CV140628 |

| Ref. No. or File No.: |
|---|
| none |

PROOF OF SERVICE OF SUMMONS

1. At the time of service I was a citizen of the United States, at least 18 years of age and not a party to this action.

2. I served copies of: Summons; Civil Case Cover Sheet; Complaint; Civil Lawsuit Notice; ADR Information    **BY FAX**

3. a. Party served: Penthouse Media Group, Inc.

   b. Person Served: Corporation Trust Co., Scott LaScala - Person authorized to accept service of process

4. Address where the party was served: 2711 Centerville Road Suite 400
   Wilmington, DE 19808

5. I served the party
   a. by personal service. I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) or *(date)*: 4/23/2009    (2) at *(time)*: 2:12 PM

6. The "Notice to the Person Served" (on the summons) was completed as follows:

   c. on behalf of:

   Penthouse Media Group, Inc.

   under:    CCP 416.10 (corporation)

7. Person who served papers
   a. Name:    Daniel Newcomb
   b. Address:    One Legal - 194-Marin
                  504 Redwood Blvd #223
                  Novato, CA 94947
   c. Telephone number: 415-491-0606

   d. The fee for service was: $ 79.00

   e. I am
      (1) Not a registered California process server.

8. I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Date: 4/24/2009

Daniel Newcomb
*(NAME OF PERSON WHO SERVED PAPERS)*

_____ *(SIGNATURE)*

Form Adopted for Mandatory Use
Judicial Council of California POS-010
[Rev. Jan 1, 2007]

PROOF OF SERVICE OF SUMMONS

Code of Civil Procedure, § 417.18

OL# 1756379

# EXHIBIT 4

POS-010

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):<br>Amanda Metcalf, 57177<br>LAW OFFICE OF AMANDA METCALF<br>29 Marin Bay Park Ct<br>San Rafael, CA 94901<br>TELEPHONE NO.: (415) 454-0945<br>ATTORNEY FOR (Name): Plaintiff | FILED<br><br>2009 MAY -1  PM 3:05<br><br>David H. Yamasaki, Chief Exec Superior<br>Court    California<br>By_____<br>Deputy Clerk<br>G. Duarte<br>UCS<br><br>FOR COURT USE ONLY |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF
Superior Court of California, Santa Clara County
191 N. First Street
San Jose, CA 95113-1090

PLAINTIFF/PETITIONER: Natalie Cedeno

DEFENDANT/RESPONDENT: FriendFinder Networks, Inc., et al

CASE NUMBER:
109CV140628

| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.:<br>none |
|---|---|

1. At the time of service I was a citizen of the United States, at least 18 years of age and not a party to this action.

2. I served copies of: Summons; Civil Case Cover Sheet; Complaint; Civil Lawsuit Notice; ADR Information    **BY FAX**

3. a. Party served: Paul Asher, an individual

 b. Person Served: party in item 3a

4. Address where the party was served: 6800 Broken Sound Parkway 100
 Boca Raton, FL 33487

5. I served the party
 a. by personal service. I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) or (date): 4/24/2009    (2) at (time): 2:30 PM

6. The "Notice to the Person Served" (on the summons) was completed as follows:
 a. as an individual defendant.

7. Person who served papers
 a. Name:      Richard Largo
 b. Address:    One Legal - 194-Marin
        504 Redwood Blvd #223
        Novato, CA 94947
 c. Telephone number: 415-491-0606
 d. The fee for service was: $ 149.00
 e. I am:
      (1) Not a registered California process server.

8. I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Date: 4/24/2009

Richard Largo
(NAME OF PERSON WHO SERVED PAPERS)

_(signature)_

Form Adopted for Mandatory Use
Judicial Council of California POS-010
[Rev. Jan 1, 2007]

**PROOF OF SERVICE OF SUMMONS**

Code of Civil Procedure, § 417.10

OL# 1756380

# EXHIBIT 5

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Amanda Metcalf, 57177<br>LAW OFFICE OF AMANDA METCALF<br>29 Marin Bay Park Ct<br>San Rafael, CA 94901<br>TELEPHONE NO.: (415) 454-0945<br>ATTORNEY FOR *(Name):* Plaintiff | **FILED**<br>APR 24 2009<br>David H. _____ Superior Court<br>County _____ California<br>By: _____ Deputy Clerk<br>J. Cao-Nguyen |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF |
|---|
| Superior Court of California, Santa Clara County<br>191 N. First Street<br>San Jose, CA 95113-1090 |

| PLAINTIFF/PETITIONER: Natalie Cedeno | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: FriendFinder Networks, Inc., et al | 108CV140628<br>109 |
| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.:<br>none |

1. At the time of service I was a citizen of the United States, at least 18 years of age and not a party to this action.

2. I served copies of: Civil Case Cover Sheet, Summons, Complaint, Civil Lawsuit Notice, ADR Information Sheet

3. a. Party served: FriendFinder Networks, Inc.

   b. Person Served: CSC - Becky DeGeorge - Person authorized to accept service of process

4. Address where the party was served:  2730 Gateway Oaks Dr
   Sacramento, CA 95833

5. I served the party
   a. **by personal service.** I personally delivered the documents listed in Item 2 to the party or person authorized to receive service of process for the party (1) or *(date):* 4/23/2009     (2) at *(time):* 1:51 PM

6. The "Notice to the Person Served" (on the summons) was completed as follows:

   c. on behalf of:

   FriendFinder Networks, Inc.                                    **BY FAX**

   under:      CCP 416.10 (corporation)

7. Person who served papers
   a. Name:        Tyler Dimaria
   b. Address:     One Legal - 194-Marin
                   504 Redwood Blvd #223
                   Novato, CA 94947
   c. Telephone number:   415-491-0606
   d. The fee for service was:  $ 29.00
   e. I am:
      (3) registered California process server.
         (i) Employee or independent contractor.
         (ii) Registration No.: 2006-06
         (iii) County SACRAMENTO

8. I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Date: 4/24/2009

          Tyler Dimaria
   (NAME OF PERSON WHO SERVED PAPERS)                          (SIGNATURE)

| Form Adopted for Mandatory Use<br>Judicial Council of California POS-010<br>[Rev. Jan 1, 2007] | PROOF OF SERVICE OF SUMMONS | Code of Civil Procedure, § 417.10 |
|---|---|---|

OL# 6687226

# EXHIBIT 6

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Amanda Metcalf, 57177<br>LAW OFFICE OF AMANDA METCALF<br>29 Marin Bay Park Ct<br>San Rafael, CA  94901<br>TELEPHONE NO.: (415) 454-0945<br>ATTORNEY FOR *(Name):* Plaintiff | **FILED**<br>APR 24 2009<br>UCS<br>David H. Yamasaki, Clerk of the Superior Court<br>County of Santa Clara, California<br>By: *Deputy Clerk*<br>L. QUACH-MARCELLANA |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF

Superior Court of California, Santa Clara County
191 N. First Street
San Jose, CA  95113-1090

| PLAINTIFF/PETITIONER: Natalie Cedeno | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: FriendFinder Networks, Inc., et al | 109CV140628 |

| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.:<br>none |
|---|---|

1. At the time of service I was a citizen of the United States, at least 18 years of age and not a party to this action.

2. I served copies of: Civil Case Cover Sheet, Summons, Complaint, Civil Lawsuit Notice, ADR Information Sheet

3. a. Party served: Various, Inc.

   b. Person Served: CSC - Becky DeGeorge - Person authorized to accept service of process

4. Address where the party was served:  2730 Gateway Oaks Dr
                                 Sacramento, CA  95833

5. I served the party
   a. by personal service. I personally delivered the documents listed in item 2 to the party or person authorized to
      receive service of process for the party (1) or *(date):* 4/23/2009       (2) at *(time):*  1:51 PM

6. The "Notice to the Person Served" (on the summons) was completed as follows:

   c. on behalf of:

Various, Inc.

   under:    CCP 416.10 (corporation)

**BY FAX**

7. Person who served papers
   a. Name:          Tyler Dimaria
   b. Address:     One Legal - 194-Marin
                 504 Redwood Blvd #223
                 Novato, CA  94947
   c. Telephone number:  415-491-0606
   d. The fee for service was:  $ 29.00
   e. I am:
      (3) registered California process server.
        (i)  Employee or independent contractor.
        (ii) Registration No.: 2006-06
        (iii) County SACRAMENTO

8. I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Date: 4/24/2009

Tyler Dimaria
(NAME OF PERSON WHO SERVED PAPERS)                               (SIGNATURE)

| Form Adopted for Mandatory Use<br>Judicial Council of California POS-010<br>[Rev. Jan 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Code of Civil Procedure, § 417.10 |
|---|---|---|

OL# 6687227